IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————

No. 19-510 T

(Judge Edward H. Meyers)

PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant.

———————

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT OF CROSS-MOTION AND IN RESPONSE TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

———————

RICHARD E. ZUCKERMAN
 Principal Deputy
 Assistant Attorney General

DAVID I. PINCUS
G. ROBSON STEWART
JASON BERGMANN
COURTNEY M. HUTSON
PATRICK PHIPPEN
 Attorneys
 Justice Department (Tax)
 Court of Federal Claims Section
 P.O. Box 26
 Ben Franklin Post Office
 Washington, D.C. 20044
 (202) 616-3425
 (202) 514-9440 (E-Fax)
 jason.bergmann@usdoj.gov

# TABLE OF CONTENTS

**Page**

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** ....................................i

**MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**...................................................................... 1

**INTRODUCTION AND SUMMARY OF ARGUMENT** ........................................... 1

**LEGAL BACKGROUND** ............................................................................................ 5

    A.    Taxation of traditional fuels and alternative fuels .................................. 6

    B.    Treatment of butane for excise-tax purposes......................................... 7

    C.    Excise-tax credit for alternative fuel mixtures ...................................... 7

    D.    The response by Treasury and Congress to tax-credit claims based on the
use of butane to produce traditional gasoline ....................................... 9

**STATEMENT OF FACTS**.......................................................................................... 12

    A.    Hydrocarbons and gasoline .................................................................. 12

    B.    Butane, and its production, purchase, and use by PES.......................... 14

    C.    The production of refined gasoline products by PES ............................ 16

    D.    The alternative fuel mixture credits claimed by PES ........................... 18

**ARGUMENT** ............................................................................................................... 19

    A.    Butane is a "taxable fuel" and not an "alternative fuel" with respect to the
alternative fuel mixture credit under § 6426(e) ................................... 19

        1.    Text and context of § 6426(e)...................................................... 21

        2.    Treasury's longstanding interpretation of the statutory terms................. 24

        3.    Purpose of the alternative fuel mixture credit ........................... 27

        4.    The counterarguments by PES lack merit ................................. 30

## TABLE OF CONTENTS
### (Continuation)

Page

B.    As used in § 6426(d)(2), "liquefied petroleum gas" refers to propane autogas, an alternative motor fuel used in the United States, and not to a broad category of gases that includes butane.....................................35

    1.    Congress equates "liquefied petroleum gas" with propane.......................35

    2.    In the alternative-fuel context, LPG means propane autogas, not butane ....................................................................36

    3.    The Court should reject the contrary definitions of LPG offered by PES..................................................................41

    4.    The Court should adopt the government's interpretation of LPG ............46

C.    The "blending butane" used by PES contained heavy hydrocarbons and did not qualify as "liquefied petroleum gas" under fuel-industry specifications .............47

**CONCLUSION**...........................................................................................50

**APPENDIX OF EXHIBITS**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AD Global Fund, LLC v. United States*, 67 Fed. Cl. 657 (2005)...........................................26n

*Alfaro v. Commissioner*, 349 F.3d 255 (5th Cir. 2003) ........................................................26n

*Bank of Commerce v. Tenn.*, 161 U.S. 134 (1896)...........................................................20, 47

*BASR Partnership v. United States*, 795 F.3d 1338 (Fed. Cir. 2015)............................... 19-20

*Better Business Bureau of Washington, D.C. v. United States*,
    326 U.S. 279 (1945) .........................................................................................................24

*BNSF Ry. Co. v. Loos*, 139 S. Ct. 893 (2019)..........................................................................24

*Buckeye Power Inc. v. United States*, 38 Fed. Cl. 154 (1997)..............................................44n

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................................48

*CFTC v. Schor*, 478 U.S. 833 (1986) ......................................................................................26

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) ................................................... 46-47

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) .............................................................20, 30

*Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743 (2019) ................................................19

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988)...............................................................19

*King v. Burwell*, 576 U.S. 473 (2015) ....................................................................................27

*N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973) ...........................................27

*Nat'l Union Fire Ins, Co. v. ExxonMobil Gas & Power Mktg. Co.*,
    691 F. App'x 195 (5th Cir. 2017) (per curiam) ................................................................43

*Natale v. E. Coast Salon Servs., Inc.*, No. 13-1254, 2016 WL 659722
    (D.N.J. Feb. 18, 2016) ...................................................................................................44n

*Phillips Pipe Line Co. v. United States*, 94 Ct. Cl. 462 (1941) ........................................ 42-43

*Principal Life Ins. Co. v. United States*, 95 Fed. Cl. 786 (2010).............................................44

*Principal Mut. Life Ins. Co. v. United States*, 295 F.3d 1241 (Fed. Cir. 2002)....................26n

# TABLE OF AUTHORITIES

**Page(s)**

**Cases(Continuation):**

*Qureshi v. United States*, 67 Fed. Cl. 783 (2005),
    *aff'd*, 200 F. App'x 973 (Fed. Cir. 2006) ..........................................................44

*Shamrock Oil & Gas Corp. v. Commissioner*, 35 T.C. 979 (1961)........................................43

*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735 (1996)................................................25

*Star-Glo Assocs., LP v. United States*, 414 F.3d 1349 (Fed. Cir. 2005) ........................... 27-28

*Sunoco Partners Mktg. & Terminals v. U.S. Venture*,
    No. 15-C-8178, 2017 WL 4283946 (N.D. Ill. 2017).......................................................29

*Sunoco, Inc. v. United States*, 129 Fed. Cl. 322 (2016),
    *aff'd*, 908 F.3d 710 (Fed. Cir. 2018)......................................................20, 32, 47

*Sunoco, Inc. v. United States*, 908 F.3d 710 (Fed. Cir. 2018),
    *cert. denied*, 140 S. Ct. 46 (2019)......................................................19

*United States v. McFerrin*, 570 F.3d 672 (5th Cir. 2009) ......................................................20

*United States v. Stewart*, 311 U.S. 60 (1940)......................................................20

*United States v. Wells Fargo Bank*, 485 U.S. 351 (1988)................................................20, 22

*Valero Marketing & Supply Co. v. United States*,
    No. 5:19-cv-328, Dkt. 38 (W.D. Tex. July 31, 2020)......................................................3n

*U.S. Venture, Inc. v. United States,* 448 F. Supp. 3d 979, 983-84
    (E.D. Wis. 2020), *appeal pending*, No. 20-1861 (7th Cir.)......................................................*passim*

*Vitol, Inc. v. United States*, 2020 WL 1442136 (S.D. Tex. Feb. 25, 2020),
    *report and recommendation adopted by* 2020 WL 1466121
    (S.D. Tex. Mar. 24, 2020), *appeal pending*, No. 20-20237 (5th Cir.)......................................................*passim*

*Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1 (2001) ......................................................10n, 44

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C.)

    § 4041 .............................................................................................*passim*

    § 4081 .............................................................................................*passim*

    § 4083 .............................................................................................*passim*

    § 6110 .................................................................................................44

    § 6426 .............................................................................................*passim*

American Jobs Creation Act of 2004, P.L. 108-357, § 301 (2004)......................................32n

American Taxpayer Relief Act of 2012, P.L. 112-240, § 412 (2013)....................................8n

Bipartisan Budget Act of 2018, P.L. 115-123, § 40415 (2018) ............................................8n

Cal. Veh. Code § 380..............................................................................................41, 47

Cal. Veh. Code § 27909.................................................................................................41

Consolidated Appropriations Act, 2016, P.L. 114-113, § 192 (2015) ...................................8n

Consolidated Appropriations Act, 2021, H.R. 133, 116th Cong., Div. EE,
    § 146 (enacted 2020) ............................................................................................8n

Emergency Economic Stabilization Act of 2008, P.L. 110-343, § 204 (2008) ....................8n

Excise Tax Reduction Act of 1954, P.L. 83-324, § 507 (1954) .............................. 6, 10, 22-23

Further Consolidated Appropriations Act, 2020, P.L. 116-94, § 133 (2019)........2, 8n, 11, 11n

Revenue Act of 1932, P.L. 72-154, § 617 (1932) ....................................................................6

Safe, Accountable, Flexible, Efficient Transportation Equity Act,
    P.L. 109-59, § 11113 (2005)..................................................................................7, 8, 23

Surface Transportation & Veterans Health Care Choice Improvement Act
    of 2015, P.L. 114-41, § 2008 (2015) ..................................................................................23

Tax Increase Prevention Act of 2014, P.L. 113-295, § 160 (2014)........................................8n

Tax Relief, Unemployment Insurance Reauthorization & Job Creation Act
    of 2010, P.L. 111-312, § 704 (2010) ..................................................................................8n

Taxpayer Relief Act of 1997, P.L. 105-34, § 907 (1997)....................................................23n

# TABLE OF AUTHORITIES

**Page(s)**

**Legislative Authorities:**

165 Cong. Rec. S7185 (daily ed. Dec. 19, 2019) ................................................................*passim*

H.R. Rep. 105-220 (1997) (Conf. Rep.) .......................................................................... 36

H.R. Rep. 109-203 (2005) (Conf. Rep.) ............................................................. 5, 9, 26, 36

H.R. Rep. 116-379 (2020) ...............................................................................................*passim*

S. Rep. 105-33 (1997).................................................................................................... 36

S. Rep. 109-82 (2005).............................................................................................. 35-36

Joint Comm. on Tax'n, *Description of the "Energy Policy Tax Incentives Act
of 2005,"* JCX-44-05 (2005) ..................................................................................... 35

Joint Comm. on Tax'n, *Gen'l Explanation of Tax Legislation Enacted in the
109th Congress*, JCS-1-07 (2007) ............................................................................. 36

Joint Comm. on Tax'n, *Present Law Energy-Related Tax Provisions &
Proposed Modifications Contained in the President's Fiscal Year 2011
Budget*, JCX-23-10 (2010) .................................................................................. 9, 23

Joint Comm. on Tax'n, *Technical Explanation of the Revenue Provisions
Contained in the "American Workers, State, and Business Relief Act of
2010," as Passed by the Senate on March 10, 2010*, JCX-11-10 (2010).................... 32n

Joint Comm. on Tax'n, *Gen'l Explanation of Tax Legislation Enacted in the
111th Congress*, JCS-2-11 (2011) ............................................................................. 26

Joint Comm. on Tax'n, Description of the Chairman's Mark of a Proposal to
Convert the Tax on Liquefied Natural Gas and Liquefied Petroleum Gas to
an Energy Equivalent Basis, JCX-32-15 b(2015) ...................................................... 24n

Joint Comm. on Tax'n, *Description of the Chairman's Modification to the
Chairman's Mark of a Bill to Extend Certain Expired Tax Provisions*,
JCX-103-15 (2015)..................................................................................................... 36

Joint Comm. on Tax'n, *Gen'l Explanation of Tax Legislation Enacted in
2015*, JCS-1-16 (2016) ........................................................................................ 24n, 26

Joint Comm. on Tax'n, *Fed. Tax Provisions Expired in 2017*,
JCX-5-18 (2018)..................................................................................................... 10n, 27

## TABLE OF AUTHORITIES

**Page(s)**

**Legislative Authorities (Continuation):**

Joint Comm. on Tax'n, *Fed. Tax Provisions Expired in 2017 & 2018 & Expiring in 2019*, JCX-8-19 (2019)............................................................. 10n-11n, 27

Joint Comm. on Tax'n, Memorandum (Nov. 20, 2019)..........................................2

**Administrative Authorities:**

Treasury Regulations (26 C.F.R.):

§ 1.7704-4 ......................................................................................43n

§ 1.927(a)-1T ..................................................................................43n

§ 1.993-3 .........................................................................................43n

§ 48.4041-8 ..........................................................6, 8n, 10, 25n, 32, 43

§ 48.4081-1 .............................................7, 7n, 9, 21, 25, 32, 33, 34

Treas. Reg. (26 C.F.R.) § 48.4041-7 (1960)..................................6, 25, 25n, 43

Notice 2006-92, 2006-2 C.B. 774 (2006) ....................................9, 25, 35

Rev. Rul. 88-70, 1988-2 C.B. 338 (1988) ...............................................7

Rev. Rul. 2018-2, 2018-2 I.R.B. 277 (2018) ...........................2, 4, 10, 27

13 C.C.R. § 2290 ..........................................................................42

13 C.C.R. § 2292.6 .......................................................................42

24 C.F.R. § 3280.702 ....................................................................47

24 C.F.R. § 3280.703 ...................................................................42n

29 C.F.R. § 1910 .........................................................................42n

33 C.F.R. § 127.005 .....................................................................42n

40 C.F.R. § 1065.720(a), (c) .........................................................41n

46 C.F.R. § 58.16-5 ......................................................................42n

## TABLE OF AUTHORITIES

**Page(s)**

**Administrative Authorities (Continuation):**

    49 C.F.R. § 173.315(b)(1)(i)...................................................................42n

    25 Fed. Reg. 11217 (1960) ...........................................................6, 10, 24

    51 Fed. Reg. 11 (1986) ............................................................................7

    57 Fed. Reg. 32424 (1992) ..................................................................7, 25

    58 Fed. Reg 38 (1993) ..............................................................................8

    60 Fed. Reg. 40079 (1995) ...............................................................7, 25n

    70 Fed. Reg. 74522 (2005) ...................................................................28

**Non-Authoritative Administrative Documents:**

    Internal Revenue Manual § 21.7.8.4.1.4.4.10..........................................45

    Technical Advice Memorandum 6007058570A (July 5, 1960) .............45

    Private Letter Ruling 6007053230A (July 5, 1960) ..............................45

**Industrial and Technical Authorities:**

    Alternative Fuels Data Center, Dep't of Energy, *Propane Fuel Basics* .........................36, 37n

    Alternative Fuels Data Center, Dep't of Energy, *Propane Vehicles* ..............................13, 37n

    ASTM International, D1835, Standard Specification for Liquefied Petroleum (LP) Gases ........................................................................40, 48

    Campbell, Wyszynski & Stone, *Combustion of LPG in a Spark-Ignition Engine*, SAE Technical Paper 2004-01-0974 (2004) ........................................39

    Chemistry: Atoms First 2e, "Organic Chemistry," ch. 21 (OpenStax 2019) .............12, 13, 48

    Encyclopedia Britannica, *Petroleum* (Aug. 12, 2019).......................................12, 31

    Energy Information Admin., Dep't of Energy, *Alternative Fuel Vehicle Data: Definitions, Sources and Explanatory Notes*, 1 (2019) .......................................37

    Energy Information Admin., Dep't of Energy, *Alternatives to Traditional Transportation Fuels: An Overview* (1994) .................................................. 36-37

# TABLE OF AUTHORITIES

**Page(s)**

**Industrial and Technical Authorities (Continuation):**

Energy Information Admin., Dep't of Energy, *Glossary* ...................................................13, 31

Energy Information Admin., Dep't of Energy, *Hydrocarbon gas liquids explained, Uses of hydrocarbon gas liquids* ......................................................................14

Energy Information Admin., Dep't of Energy, FAQs, *What is the Difference Between Crude Oil, Petroleum Products, and Petroleum?* ............................................31n

Gas Processors Ass'n, GPA 2140, *Standard for Liquid Petroleum Gas Specifications and Test Methods* .................................................................40, 48

Mary Joyce, EIA, *Developments in U.S. Alternative Fuel Markets* (2000) ...........................37

William L. Leffler, Natural Gas Liquids: A Nontechnical Guide (2014) ............13, 15, 39, 43

William L. Leffler, Petroleum Refining in Nontechnical Language (4th ed. 2008) ...............................................................................13, 14, 15, 47

Nat'l Propane Gas Ass'n, An Assessment of Propane as an Alternative Transportation Fuel in the United States (June 1989) .......................................................14

Oak Ridge Nat'l Labs, Dep't of Energy, Data Transp. Energy Data Book, Table B.4, Heat Content for Various Fuels (Edition 32) (2013) .................................................24

Oak Ridge Nat'l Labs., History of Significant Vehicle and Fuel Introductions in the United States, (2017) ...................................................................................37n

Office of Energy Efficiency & Renewable Energy, Dep't of Energy, www.fueleconomy.gov, *Propane: Liquefied Petroleum Gas (LPG)* ..............................37n

Office of Energy Efficiency & Renewable Energy, Dep't of Energy, *State & Alternative Fuel Provider Fleets: Key Transportation Terminology* ..............................37n

Rengarajan, et al., *LPG Direct Injection Engine for Medium Duty Trucks*, SAE Technical Paper 2020-01-5008 (2020) ........................................................ 39-40

U.S. Dep't of Trans., *Fuels and Vehicle Technology* ........................................................38, 46

# **TABLE OF AUTHORITIES**

**Page(s)**

**Other Authorities:**

American Heritage College Dictionary at 892 (4th ed. 2002)................................................21

American Heritage Dictionary (4th ed. 2000) ........................................................................22

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .........................................................................................................................46

Random House College Dictionary (rev. ed. 1982) ...............................................................21

## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to RCFC 56, Defendant, the United States of America, respectfully moves for summary judgment on all counts one through sixteen in plaintiff's Amended Complaint, which seek over $550 million of alternative fuel mixture tax credits under I.R.C. § 6426€, based on the alleged production of a "fuel mixture consisting of butane and gasoline." (Dkt. 12, ¶ 2.) Because the parties stipulated to a dismissal with prejudice of the remaining counts in the Amended Complaint, defendant respectfully suggests that the Court should enter judgment in its favor. This motion is based on the ground that there are no material factual disputes, and the Court may resolve this case as a matter of law.

Defendant's motion is based on three separate and independent grounds, each of which alone would support a judgment in favor of the United States. *First*, plaintiff's claims for the alternative fuel mixture credit fail as a matter of law, because butane cannot be an "alternative fuel" for the purpose of § 6426(e), because it has long been included within the statutory and regulatory definition of gasoline, and it is therefore a "taxable fuel." *Second*, plaintiff's claims for the alternative fuel mixture credit fail as a matter of law, because liquefied petroleum gas in the context of alternative fuels refers to propane autogas, and butane does not qualify. And, *third*, the "blending butane" that PES used to produce gasoline did not qualify as an LPG, even under plaintiff's proposed definition of liquefied petroleum gas. It is beyond dispute that plaintiff's so-called "butane" included substantial heavy-hydrocarbon contaminants such as pentanes and hexanes, and it did not constitute liquefied petroleum gas as a result.

Defendant's motion is based on the attached summary judgment memorandum, the Appendix of Exhibits filed herewith, and all other pleadings on file in this case.

Respectfully submitted,

December 28, 2020                    *s/ Jason Bergmann*
                                    JASON BERGMANN
                                    U.S. Department of Justice, Tax Division
                                    Post Office Box 26
                                    Washington, D.C. 20044
                                    Tel: (202) 616-3425
                                    Fax: (202) 514-9440
                                    jason.bergmann@usdoj.gov

                                    RICHARD E. ZUCKERMAN
                                       Principal Deputy Assistant Attorney General
                                    DAVID I. PINCUS
                                       Chief, Court of Federal Claims Section
                                    G. ROBSON STEWART
                                       Assistant Chief

December 28, 2020                    *s/ G. Robson Stewart*
                                    Of Counsel

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

————————

No. 19-510 T

(Judge Edward H. Meyers)

PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant.

————————

**MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

————————

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this tax-refund suit, Philadelphia Energy Solutions ("PES") seeks over $550 million of tax credits, based on the alleged production of a "fuel mixture consisting of butane and gasoline." (Dkt. 12, ¶ 2.) The tax credit in question is the "alternative fuel mixture credit." Section 6426(e)[1] allows a tax credit for the production of an "alternative fuel mixture"— a mixture of "alternative fuel" (*e.g.,* P Series Fuels) with "taxable fuel" (*e.g.,* gasoline). The credit—available for the last fifteen years—is intended to "reduce U.S. reliance on conventional gasoline" and other traditional fuels. H.R. Rep. 116-379 at 61 (2020) [Ex. 41].[2] PES contends that it is entitled to the tax credit because: (1) it allegedly blended butane into gasoline;[3] (2) in the petroleum industry, butane is considered to be a liquefied petroleum gas, and (3) the statute defined "liquefied petroleum gas" as an "alternative fuel" for the tax periods at issue.

However, butane is a common and longstanding component of traditional gasoline, and "[a]dding butane during the gasoline refining process is simply how gasoline is produced." 165 Cong. Rec. S7185 (daily ed. Dec. 19, 2019) [Ex. 42]. The blending of butane with other components to make traditional gasoline does not produce an alternative fuel mixture under § 6426(e). There is nothing *alternative* about traditional gasoline. In the words of Senator Wyden, "[t]he idea that Congress intended oil companies to benefit from a credit intended to

---

[1] Unless indicated otherwise, all "§" citations are to the Internal Revenue Code (26 U.S.C.) and all "Reg. §" citations are to the Treasury Regulations (26 C.F.R.) in effect during the tax periods at issue (2014-2017).

[2] Copies of certain factual documents, legislative and administrative records, and legal authorities are enclosed in an Appendix to this Memorandum, and are referred to by their exhibit numbers ("Ex.").

[3] In fact, as described further below (at 16-18), PES actually blended what it describes as "blending butane" with other hydrocarbons to produce the refined products known as Conventional Blendstocks for Oxygenate Blending ("CBOBs") and Reformulated Blendstocks for Oxygenate Blending ("RBOBs"), which were ultimately mixed with ethanol to create gasoline.

reduce our dependence on traditional gasoline by rewarding them for making traditional gasoline doesn't pass the commonsense test." *Id.*

During the first decade after Congress enacted the alternative fuel mixture credit, no gasoline producers claimed that the standard use of butane to produce gasoline qualified. H.R. Rep. 116-379 at 61; 165 Cong. Rec. S7185. In recent years, however, dozens of gasoline producers began making such claims, seeking *billions* of dollars in alternative-fuel-mixture subsidies for what Congress and Treasury consider to be ordinary, traditional gasoline. *See* H.R. Rep. 116-379 at 61-62; Joint Comm. on Tax'n, Nov. 20, 2019 Memo. at 1. [Ex. 43]. In response, Treasury reaffirmed its long-standing position that butane "used . . . in the production of finished gasoline" qualifies as "a taxable fuel and not an alternative fuel." Rev. Rul. 2018-2, 2018-2 I.R.B. 277, 2017 WL 6389843 [Ex. 44]. After gasoline producers continued to pursue such claims, Congress clarified § 6426(e) in 2019 to disallow the alternative fuel mixture credit for mixtures of taxable fuel with liquefied petroleum gas, in order "to protect the public fisc and to prevent a windfall resulting from erroneous interpretations of the law." Further Consolidated Appropriations Act, 2020, P.L. No. 116-94, § 133(b)(1), 133 Stat. 2534, 3233–34 (2019) [Ex. 45]; H.R. Rep. 116-379 at 62.

Judging by its original excise-tax returns for the quarters at issue, PES initially recognized that the use of butane to produce gasoline does not qualify for an alternative fuel mixture credit. (*See* Dkts. 50-3–50-14; Dkt. 50-44 (first claiming the tax credit on *amended* excise-tax returns)). PES had followed the standard petroleum-industry practice of using butane as a component of gasoline not because of a belief that PES would be entitled to tax credits, but rather because butane was the least expensive component of traditional gasoline, and PES could maximize its profits by using as much butane as EPA regulations allowed.

-2-

In "conversations with KPMG in approximately early April 2017," PES first became aware of a tax scheme under which gasoline producers would claim alternative fuel mixture credits for the butane they used to make gasoline. (PES Resp. Int. 2 [Dkt. 50-22 at A-669]). Only after KPMG had marketed that "aggressive tax position" (H.R. Rep. 116-379 at 61-62), did PES change course and claim that its butane-blending activities—*i.e.*, its production of traditional gasoline—qualified for the alternative fuel mixture credit. (*See* Dkts. 50-3–50-14; Dkt. 50-44.)

The original tax reporting by PES was correct. Both the Treasury Department and Congress have rightly rejected the suggestion that blending butane into gasoline qualifies for the tax credit, as have two district courts that resolved tax-credit lawsuits by gasoline producers in the government's favor. In *U.S. Venture, Inc. v. United States*, the U.S. District Court for the Eastern District of Wisconsin held that "butane is a taxable fuel and therefore cannot be an alternative fuel for purposes of the alternative fuel mixture credit," based on the language of the Code and Treasury Regulations, "the context of the overall statutory scheme," and the statute's "purpose." 448 F. Supp. 3d 979, 983-84 (E.D. Wis. 2020), *appeal pending*, No. 20-1861 (7th Cir.). Likewise, in *Vitol, Inc. v. United States*, the U.S. District Court for the Southern District of Texas undertook a similar analysis, and rejected the taxpayer's claim for the additional reasons that it is contrary to Rev. Rul. 2018-2 and produces an absurd result. No. H-18-2275, 2020 WL 1442136 (S.D. Tex. Feb. 25, 2020), *report and recommendation adopted by* 2020 WL 1466121 (S.D. Tex. Mar. 24, 2020), *appeal pending*, No. 20-20237 (5th Cir.).[4]

---

[4] A third district has considered the issue. *Valero Marketing & Supply Co. v. United States*, No. 5:19-cv-328, Dkt. 38 (W.D. Tex. July 31, 2020) (order granting partial judgment on the pleadings to the United States) [Ex. 46]. In *Valero*, the court reviewed the decisions in *Venture* and *Vitol*, found the decisions' "reasoning persuasive," but declined to decide the issue before the parties briefed it. *Id.* at 19.

The Court should follow their lead here. The Court should deny the motion by PES for partial summary judgment "that butane is a liquefied petroleum gas and, therefore, an 'alternative fuel' for purposes of the alternative fuel mixture credit under" § 6426(e). (Dkt. 50 at 1.) And the Court should grant defendant's cross-motion for summary judgment on the sixteen remaining counts of the Amended Complaint, which aver—for the first quarter of 2014 through the fourth quarter of 2017—that PES produced alternative fuel mixtures by mixing butane (an alleged alternative fuel) with gasoline (an alleged taxable fuel). (Dkt. 12, ¶¶ 2, 25, 39, 56-119.)

As this Memorandum will show, there are three reasons why the Court should reject the sixteen claims for alternative fuel mixture credits based on the use of butane to produce gasoline. *First*, butane cannot be an "alternative fuel" for § 6426(e), because it has long been included within the statutory and regulatory definition of gasoline, and is therefore a "taxable fuel." When PES blended butane with other gasoline blend stocks to produce refined gasoline products (*i.e.,* CBOBs and RBOBs), it was—for excise-tax purposes—blending a "taxable fuel" and a "taxable fuel," which does not create an alternative fuel mixture under § 6426(e). Treasury so recognized in Revenue Ruling 2018-2, reaffirming the longstanding exclusion of taxable fuels from the scope of alternative fuels under the Internal Revenue Code, and the district courts so held in *Venture* and *Vitol*. The contrary position would wholly undermine the purpose of the tax credit, which is to encourage alternatives to traditional gasoline, rather than to subsidize gasoline itself.

*Second*, butane does not qualify as "liquefied petroleum gas" for the purpose of § 6426(e). While the petroleum industry generally classifies butane as one of a group of liquefied petroleum gases, the term "liquefied petroleum gas," or "LPG," has a narrower meaning in the context of alternative fuels. In the alternative-fuel industry, LPG refers to a specific substance called "propane autogas" (or "HD-5 propane"), a motor fuel in the United States that consists

-4-

primarily of propane, but which may also include small amounts of propylene, butane and butylene. Because § 6426(d)(2) defines liquefied petroleum gas as one of seven "alternative fuels," the Court should apply the term's narrower meaning from the alternative-fuel industry, rather than its broader usage from the petroleum industry. Moreover, when Congress considered enacting the tax credit in 2005, congressional committees emphasized—consistent with the usage of the term in the alternative-fuel context—that liquefied petroleum gas is synonymous with "propane." *E.g.,* H.R. Rep. 109-203 at 1109, 1119 (Conf. Rep.) (2005) [Ex. 47]. Thus, the claim by PES that butane qualifies as liquefied petroleum gas for § 6426(e) is without merit.

*Third*, even under the petroleum industry's definition of liquefied petroleum gas, the so-called "butane" that PES used to produce gasoline did not qualify as an LPG as a factual matter. To qualify as liquefied petroleum gas under petroleum-industry specifications, butane may contain no more than 2.0% pentanes or heavier hydrocarbons. But here, the "blending butane" that PES used when producing refined products contained far more than the allowable percentage. Because pentanes and heavier hydrocarbons are *liquid* at standard temperature and pressure, they do not constitute liquefied petroleum *gas* under any definition of the term. Any butane-containing substance that includes more than 2.0% pentanes likewise fails to qualify. Thus, even if the Court were to agree with PES that butane qualifies as LPG under § 6426 based on petroleum-industry usage, the substance called "blending butane" that PES actually used to make gasoline would *not*, because it does not satisfy the petroleum-industry specifications for liquefied petroleum gas.

## LEGAL BACKGROUND

This case involves provisions of the Internal Revenue Code that impose excise taxes on gasoline (§§ 4081, 4083) and alternative fuels (§ 4041) and provide credits against those taxes (§ 6426). Some background may be helpful to understand those provisions and related regulations.

A.      **Taxation of traditional fuels and alternative fuels**

Congress has long imposed excise taxes on certain types of fuel. Since 1932, it has taxed

gasoline used in transportation vehicles. *See* Revenue Act of 1932, P.L. 72-154, § 617(a),

47 Stat. 169, 266 (imposing a one-cent-per-gallon tax on such gasoline); § 4081 (current

codification of the excise tax on gasoline and other traditional fuels). And since 1954, Congress

has taxed "alternative fuels" (originally called "special motor fuels") used in transportation

vehicles. *See* Excise Tax Reduction Act of 1954, P.L. 83-324, § 507(b), 68 Stat. 37, 44

(imposing a two-cent-per-gallon tax on such "special motor fuels"); § 4041(a)(2) (current

codification of the excise tax on "alternative fuels").

Over the years, Congress has generally maintained the excise-tax dichotomy between

traditional and alternative fuels. Traditional fuels—gasoline, diesel fuel, and kerosene—are

referred to as "taxable fuel" (§ 4083(a)), and are subject to tax under § 4081. Fuels that are

alternatives to those traditional fuels are subject to tax under § 4041(a)(2). Alternative fuels are

broadly defined as "any liquid" sold or used as fuel in certain motor vehicles, "other than . . . any

product taxable under section 4081." § 4041(a)(2). Congress has always excluded from the scope

of alternative/special motor fuels any fuel that is taxable under § 4081, including gasoline.

Excise Tax Reduction Act of 1954, 68 Stat. at 44 (excluding from the definition of "special

motor fuels" "any product taxable under" the predecessor of § 4081).

In November 1960, Treasury promulgated regulations defining "special motor fuel."

25 Fed. Reg. 11217 (1960). Consistent with the statute, the regulations provided that the "term

'special motor fuel' does not include diesel fuel or any product taxable under the provisions of

section 4081." 26 C.F.R. § 48.4041-7(f)(2) (1961). The regulations (now codified at Reg.

§ 48.4041-8(f)(1) & (2) [Ex. 48]) have been revised and updated over the years but have

consistently excluded fuels taxable under § 4081 from the scope of alternative/special motor fuels. *See* 51 Fed. Reg. 11, 18 (1986); 60 Fed. Reg. 40079, 40082 (1995).

**B.    Treatment of butane for excise-tax purposes**

Butane is a common component of traditional gasoline, and it has been for decades. For excise-tax purposes, Congress and Treasury treat butane as "gasoline," a "taxable fuel," and thus a fuel that is taxable under § 4081. As noted above, § 4081 imposes a tax on "taxable fuel." Taxable fuel is defined to include "gasoline." § 4083(a)(1)(A). Gasoline, in turn, is defined to include "any gasoline blend stock," to the extent prescribed in regulations. § 4083(a)(2)(B)(i). Treasury identified "butane" as a gasoline blend stock in 1988, and it promulgated regulations to that effect in 1992.[5] Rev. Rul. 88-70, 1988-2 C.B. 338 (1988) [Ex. 49]; 57 Fed. Reg. 32424 (1992) (now codified at Reg. § 48.4081-1(c)(3)(i)(B) [Ex. 50]).

**C.    Excise-tax credit for alternative fuel mixtures**

In 2005, Congress enacted a pair of excise-tax credits to encourage the development and use of alternative motor fuels as a substitute for traditional motor fuels like gasoline: (1) the alternative fuel credit (codified at § 6426(d)), and (2) the alternative fuel mixture credit (codified at § 6426(e)). Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA"), P.L. 109-59, § 11113(b)(2), 119 Stat. 1144, 1947-1948. These credits are "part of a suite of incentives intended to reduce U.S. reliance on conventional gasoline, diesel, and kerosene by focusing on alternative fuels." H.R. Rep. 116-379 at 61.

The credits for alternative fuels and alternative fuel mixtures are temporary; they periodically expire and are renewed by Congress for short periods of time. As originally enacted,

---

[5] To qualify as a "gasoline blend stock," a substance must be a "petroleum product component of gasoline." § 4083(a) (flush language). Treasury Regulations further clarify the term to exclude "any product that cannot, without further processing, be used in the production of finished gasoline." Reg. § 48.4081-1(c)(3)(ii).

the credits expired in September 2009. SAFETEA, 119 Stat. at 1948. They have been extended eight times in subsequent amendments to § 6426. The credits last expired in 2017, were subsequently extended and clarified in December 2019 (discussed further below at 11-12), and extended again in an appropriations bill just signed into law.[6]

Section 6426(d) provides a credit for each gallon of "alternative fuel" that the taxpayer used, or sold for use, as fuel in a motor vehicle or motorboat. The credit is allowed against the tax imposed by § 4041 on special motor fuels (renamed "alternative fuels" in the legislation creating the alternative-fuel credits,[7] SAFETEA, 119 Stat. at 1946). § 6426(a)(2). The amount of the alternative fuel mixture credit is the product of 50 cents and the number of gallons of "alternative fuel" used by the taxpayer in producing the mixture. § 6426(e)(1).

Section 6426(e) provides the credit at issue for each gallon of "alternative fuel" mixed with "taxable fuel" to produce a "mixture" that the taxpayer used, or sold for use, as fuel. This credit is allowed against the tax imposed by § 4081 on "taxable fuel." § 6426(a)(1). "Alternative fuel" means any of seven different categories of fuel listed in § 6426(d)(2), including "liquefied petroleum gas." § 6426(d)(2)(A). "Taxable fuel" means gasoline (defined to include gasoline blend stocks), diesel fuel, and kerosene. §§ 4083(a)(1), (a)(2)(B)(i); 6426(e)(2).

---

[6] *See* Emergency Economic Stabilization Act of 2008, P.L. 110-343, § 204(a), 122 Stat. 3765, 3834 (extending credits through 2009); Tax Relief, Unemployment Insurance Reauthorization & Job Creation Act of 2010, P.L. 111-312, § 704, 124 Stat. 3296, 3311 (through 2011); American Taxpayer Relief Act of 2012, P.L. 112-240, § 412, 126 Stat. 2313, 2343 (through 2013); Tax Increase Prevention Act of 2014, P.L. 113-295, § 160, 128 Stat. 4010, 4022 (through 2014); Consolidated Appropriations Act, 2016, P.L. 114-113, § 192(a)(1), 129 Stat. 2242, 3073 (through 2016); Bipartisan Budget Act of 2018, P.L. 115-123, § 40415(a)(1), 132 Stat. 64, 149 (through 2017); Further Consolidated Appropriations Act, 2020, P.L. 116-94, § 133(a)(1), 133 Stat. 2534, 3233 (through 2020); Consolidated Appropriations Act, 2021, H.R. 133, 116th Cong., Div. EE, § 147 (enacted) (through 2021).

[7] Regulations promulgated under § 4041 have not been updated to reflect this statutory change and continue to refer to "alternative fuel" as "special motor fuel." Reg. § 48.4041-8(f).

Butane is not listed as an alternative fuel. § 6426(d)(2). It is, however, specifically classified as a taxable fuel (a gasoline blend stock), and has been since 1992. § 4083(a)(2)(B)(i) (defining the taxable fuel "gasoline" to include "gasoline blend stock[s]" identified by Treasury); Reg. § 48.4081-1(c)(3)(i)(B) (identifying "butane" as a gasoline blend stock).

Congress was aware of butane's status when it enacted §§ 6426(d) and (e) to encourage gasoline alternatives. *See* H.R. Rep. 109-203 at 1215-1216 & n.300 (2005) (Conf. Rep.) (reciting the substances, including butane, identified as blend stocks in Reg. § 48.4081-1(c)(3)(i)). And in its explanation of the legislation, the Conference Committee further confirmed that if a substance is taxable fuel, it does not qualify as an alternative/special motor fuel. *Id.* at 1119 (explaining that "special motor fuels" do not include "any product taxable under section 4081").

Shortly after Congress enacted the new tax credits, Treasury issued published guidance regarding their operation. Notice 2006-92, 2006-2 C.B. 774 (2006) [Ex. 51]. The Notice states that an "alternative fuel" does not include any liquid that is a "taxable fuel." *Id.*, § 6(a). Congress later relied on the Notice's description of the operation of § 6426 in considering whether to extend the credit after it expired in 2009. *See* Joint Comm. on Tax'n, *Present Law Energy-Related Tax Provisions & Proposed Modifications Contained in the President's Fiscal Year 2011 Budget*, JCX-23-10, at 30 & n.15 (2010).

**D.    The response by Treasury and Congress to tax-credit claims based on the use of butane to produce traditional gasoline**

During the first ten years after its enactment, gasoline producers did not claim that their use of butane to make "conventional gasoline" qualified for the alternative fuel mixture credit. H.R. Rep. 116-379 at 61; 165 Cong. Rec. S7185. Beginning in late 2016, however, a tax-scheme promotion urged them to claim the credit on amended excise-tax returns. H.R. Rep. 116-379 at 61. The theory behind the promotion was that butane is classified in the petroleum industry as

-9-

a type of liquefied petroleum gas, an alternative fuel listed in § 6426(d)(2) and taxed under

§ 4041. *Id.* The promotion ignored the fact that butane, included within the definition of gasoline

for excise-tax purposes, is taxable under § 4081 and that, since 1954, Congress and Treasury

have excluded from the definition of alternative/special motor fuels any substance that is taxable

under § 4081. § 4041(a)(2); Excise Tax Reduction Act of 1954, 68 Stat. at 44; Reg. § 48.4041-

8(f) (current codification); 25 Fed. Reg. 11217 (1960) (originally codified at 26 C.F.R.

§ 48.4041-7(f)). The promotion also ignored the fact that the phrase "liquefied petroleum gas"

has a specific meaning in the alternative-fuel industry (discussed further below at 36-41), where

LPG does not refer to a broad category of hydrocarbons that includes butane, but rather connotes

a specific alternative/special motor fuel called propane autogas or HD-5 propane.

Confronted with numerous taxpayers claiming the alternative fuel mixture credit for

traditional gasoline, Treasury issued Revenue Ruling 2018-2 to address that meritless legal

argument.[8] The ruling concluded that the argument conflicted with the Code, regulations, and

Notice 2006-92. Rev. Rul. 2018-2, 2018-2 I.R.B. 277. As Treasury explained, (1) the tax credit

requires a mixture of a taxable fuel and an alternative fuel, (2) butane is a taxable fuel under the

Code and regulations, and (3) alternative fuels do not include taxable fuels. Thus, Treasury

reasoned, blending butane with other gasoline blend stocks to produce gasoline combines two

taxable fuels, not an alternative fuel and a taxable fuel as § 6426(e) requires.[9] *Id.*

---

[8] Revenue rulings are "interpretations of the law published by the IRS in its biannual cumulative bulletin, indicating how the IRS believes the tax law should be applied to a particular set of facts." *Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1, 6 (2001). In the Federal Circuit, they are "entitled to some weight as reflecting the Commissioner's interpretation," but they "do not have the same force as a regulation." *Id.* at 8 (quoting *Spang Industries, Inc. v. United States*, 791 F.2d 906, 913 (Fed. Cir. 1986)).

[9] Congress later relied on the ruling's explanation of the operation of the alternative fuel mixture credit in considering whether to extend it after it expired in 2017. *See* Joint Comm. on Tax'n, *Fed. Tax Provisions Expired in 2017*, JCX-5-18, at 11 n.37 (2018) (stating that "mixtures

The publication of Revenue Ruling 2018-2 did not stop taxpayers from filing refund claims based on the production of what Congress considered to be "traditional" or "conventional gasoline." H.R. Rep. 116- 379 at 61-62. Accordingly, on December 20, 2019, Congress enacted a "Clarification of Rules Regarding Alternative Fuel Mixture Credit," which disallowed the alternative fuel mixture credit for mixtures of taxable fuel with LPG and two other alternative fuels listed in § 6426(d)(2).[10] P.L. 116-94, § 133(b)(1), 133 Stat. 2534, 3233-3234. The clarification included the following "no inference" clause: "Nothing contained in this subsection or the amendments made by this subsection shall be construed to create any inference as to a change in law or guidance in effect prior to enactment of this subsection." 133 Stat. at 3234.

As the House Ways and Means Committee explained, the 2019 clarification was prompted by a tax scheme promoted to producers of conventional gasoline:

> More than a decade after [the credit's] enactment, in late 2016 or early 2017, promotional literature appeared urging taxpayers to assert on amended returns that butane (a standard component chemical present in all gasoline), when blended with gasoline, constituted an alternative fuel mixture. The theory behind this aggressive tax position is that the butane in the mixture was a form of liquefied petroleum gas, an alternative fuel. The Code does not provide a definition of liquefied petroleum gas for purposes of the alternative fuel mixture credit. The use of butane as an ingredient in gasoline predates the enactment of the alternative fuel

---

of butane and gasoline are not alternative fuel mixtures and do not qualify for the alternative fuel mixture credit under section 6426(e)") (citing Rev. Rul. 2018-2); Joint Comm. on Tax'n, *Fed. Tax Provisions Expired in 2017 & 2018 & Expiring in 2019*, JCX-8-19, at 14 n.52 (2019) (same); 165 Cong. Rec. S7185 (statement by Senator Grassley, the sponsor of the original alternative fuel mixture credit, observing that "[t]he IRS got the law correct when it issued Revenue Ruling 2018-2").

[10] The clarifying legislation applies to all fuel used or sold after the date of enactment. 133 Stat. at 3233. It also applies to fuel used or sold before enactment if such fuel was the subject of a claim filed on or after January 8, 2018 (the day Rev. Rul. 2018-2 was published) that the IRS had not paid or allowed as of the enactment date. *Id.* at 3233-3234. As explained further in defendant's motion for judgment on the pleadings (Dkt. 28), the statutory clarification does not apply to counts one through twelve of the Amended Complaint, for which refund claims were filed before January 8, 2018, but it does apply to counts thirteen through sixteen, for which refund claims were only filed afterwards.

> mixture credit by many years and Congress never intended to incentivize such a widespread and established practice in the production of conventional gasoline necessary to meet environmental and performance standards.

H.R. Rep. 116-379 at 61 (explaining parallel House Bill (H.R. 3301)). The Committee further observed that taxpayers in pending lawsuits were proposing an "interpretation [that] is not consistent with Congressional intent to subsidize fuel capable of being used as a substitute for traditional motor vehicle fuel." *Id.* at 61 n.182.

During the 2019 legislative process, the senators who sponsored the bill, including the sponsor of the original 2005 credit (Senator Grassley), admonished the gasoline industry for attempting to claim the alternative fuel mixture credit based on the use of butane to produce traditional gasoline. 165 Cong. Rec. S7185. As they explained, "the Internal Revenue Service has correctly denied such claims," which were "illegitimate," failed the "commonsense test," and "sought to turn this credit on its head." *Id.*

### STATEMENT OF FACTS

**A.    Hydrocarbons and gasoline**

*Hydrocarbons* are organic compounds containing only hydrogen (H) and carbon (C). Among the hydrocarbons are: methane ($CH_4$), ethane ($C_2H_6$), propane ($C_3H_8$), and butane ($C_4H_{10}$), which are gases at standard pressure and temperature, and pentane ($C_5H_{12}$), and hexane ($C_6H_{14}$), which are liquids at standard temperature and pressure. Chemistry: Atoms First 2e, "Organic Chemistry," ch. 21 § 21.1, Table 21.1 (OpenStax 2019) [Ex. 19]. These hydrocarbons are obtained from the extraction of crude oil and natural gas (*i.e.,* petroleum)[11] from the earth.

---

[11] Although the word "petroleum" is sometimes "restricted to the liquid form, commonly called crude oil," as "a technical term, petroleum also includes natural gas," and "it has become customary to shorten the expression 'petroleum and natural gas' to 'petroleum' when referring to both." Encyclopedia Britannica, *Petroleum* (Aug. 12, 2019) [Ex. 20].

The petroleum industry refers to hydrocarbons with various classifications. Liquefied natural gas, or LNG, is "natural gas (primarily methane) that has been liquefied by reducing its temperature to -260° Fahrenheit at atmospheric pressure." Energy Information Admin., Dep't of Energy ("EIA"), *Glossary* [Ex. 21]. Natural gas liquids, or NGLs, "come from natural gas wells or from associated gas from oil wells" and include "ethane, propane, butane, and natural gasoline [pentane]." William L. Leffler, Natural Gas Liquids: A Nontechnical Guide, at 2 (2014) [Ex. 22].) The petroleum industry refers to "liquefied petroleum gases"*, or "LPGs," as a "group of hydrocarbon gases, primarily propane, normal butane, and isobutane, derived from crude oil refining or natural gas processing." EIA, *Glossary*.

When "liquefied petroleum gas" is singular, rather than plural, the petroleum industry uses the term to identify particular fuel products containing propane, butane, or mixtures of propane and butane that also satisfy certain other industry specifications. *See* William L. Leffler, Petroleum Refining in Nontechnical Language, 241 (4th ed. 2008) [Ex. 23] (defining "liquefied petroleum gas (LPG)" as "[p]ropane and butane meeting market specifications"). However, when the singular "liquefied petroleum gas" refers to a motor fuel in the United States, it identifies "propane autogas," a specific "alternative fuel." Alternative Fuels Data Center, Dep't of Energy ("AFDC"), *Propane Vehicles* [Ex. 24].

"Gasoline is a liquid mixture of continuous- and branched-chain [hydrocarbons], each containing from five to nine carbon atoms, plus various additives to improve its performance as fuel. . . . The main source of these liquid . . . fuels is crude oil, a complex mixture that is separated by fractional distillation." Chemistry, § 21.1. In oil refineries, the individual "fractions" released by distillation are "further process[ed]" and then later "blend[ed] into finished products." PES Website, *Refining Process* [Ex. 1].

-13-

PES operated a refining complex ("the PES refinery") in Philadelphia, which included "two domestic refineries," called "Girard Point and Point Breeze." PES Website, *About* [Ex. 2]. Among other things, the PES refinery produced the refined products known as Conventional Blendstocks for Oxygenate Blending ("CBOBs"), and Reformulated Blendstocks for Oxygenate Blending ("RBOBs"). (Eggert Depo. 44:8-45:11.)[12] CBOBs and RBOBs could not themselves be used as motor-vehicle fuels in the form sold by the refinery, but they could be upon the later addition of ethanol. (Eggert Depo. 56:1-57:8; PES Depo. 53:5-54:20.)

**B.    Butane, and its production, purchase, and use by PES**

Butane ($C_4H_{10}$) is a hydrocarbon "extracted from natural gas or refinery gas streams, which is gaseous at standard temperature and pressure." EIA, *Glossary*. Butane has two isomers: normal butane ("nC4") and isobutane ("iC4"). (PES Depo. 76:22-24.) Each has different uses. Isobutane is "used predominantly as one of the feedstocks in the alkylation process"; the alkylates produced are later blended with other components to produce gasoline. Petroleum Refining at 63. Although normal butane has other uses, it is "used predominantly as a motor gasoline blending component." *Id.*; *see also* EIA, *Hydrocarbon gas liquids explained, Uses of hydrocarbon gas liquids* [Ex. 25] ("Although some normal butane is used as a fuel for lighters, most of it is blended into gasoline, especially during the cooler months"). While "billions of gallons per year of butane" are "used in the production of gasoline," butane "is not used directly as a motor vehicle fuel in the U.S." Nat'l Propane Gas Ass'n, An Assessment of Propane as an Alternative Transportation Fuel in the United States, at 2 (June 1989) [Ex. 26].

---

[12] The United States noticed two depositions during the first stage of fact discovery. The first was of Stephanie Eggert in her individual capacity ("Eggert Depo."), the transcript of which is Exhibit Q to the PES memorandum (Dkt. 50-19.) The second was of PES under Rule 30(b)(6) ("PES Depo"), in which Ms. Eggert testified again on behalf of the plaintiff. That deposition transcript is Exhibit R to the PES memorandum (Dkt. 50-20). For the sake of completeness, defendant submits corrections that Ms. Eggert proposed to both transcripts (Exs. 17, 18).

-14-

Butane has been a component of traditional gasoline in the United States for decades. *See* Petroleum Refining at 128-131 (describing historic role played by butane "as the pressuring agent of choice" in the production of gasoline); Natural Gas Liquids at 14 (noting high "demand for butane for gasoline blending" occurring "by the 1950s"). Gasoline producers incorporate butane into gasoline for two primary reasons: (1) butane increases the vapor pressure (or "RVP") of gasoline, and (2) because it is cheaper than all other gasoline blend stocks, its use is highly profitable. (*See* PES Resp. Int. 1 [Dkt. 50-22 at A-665–A-667]; Petroleum Refining at 128-131.) The amount of butane that producers may use is affected by seasonal EPA vapor-pressure requirements. Winter gasoline may "have a higher RVP, . . . which is necessary for engines to operate properly during cold winter months." (PES Resp. Int. 1 [Dkt. 50-22 at A-666–A-667].) However, the EPA restricts the RVP of summer gasoline to limit "excessive evaporation when temperatures are high" and "reduce emissions of hydrocarbons to the atmosphere in hot weather." (*Id.*; PES Butane Continuous Improvement Team: Final Report [Ex. 3] at 26.)

The PES refinery mixed "blending butane" with various other gasoline blend stocks to produce CBOBs and RBOBs. (Eggert Depo. 81:16-82:2.) PES stored the blending butane in spheres, from which it was piped to the gasoline blending units at the refinery. (Eggert Depo. 32:14-19, 39:23-40:5, 50:13-19.) The chemical composition of the blending butane was not routinely tested either when piped to the gasoline-blending units or when stored in the spheres. (Eggert Depo. 50:20-51:5.) As a result, there is no way to determine the specific chemical composition of the blending butane that PES used at the gasoline-blending units on any particular date and time. (Eggert Depo. 52:7-15; PES Depo. 92:23-94:6, 162:20-164:4.)

Nonetheless, it is quite clear that a substantial portion of the "blending butane" PES used was not butane at all. There was no purity requirement for the blending butane that PES mixed

with other gasoline blend stocks at its gasoline-blending units. (Eggert Depo. 52:16-53:6.) And, while characterizing the "[b]lending butane" it used "as [a] gasoline blendstock," PES referred to the substance not as butane but as "butane/pentane." (Ex. 3 at 22.)

The blending butane in the refinery spheres consisted of many discrete gas streams that PES comingled together. PES referred to some of the streams as "normal butane" and others as "mixed butane." (PES Depo. 39:1-40:13.) "Of the produced butane at [the PES refinery] during the 2014 to 2017 time frame," the percentage of normal butane was "roughly 20 percent" and "80 percent of the butane produced" was "mixed butane." (PES Depo. at 43:8-19.) The normal-butane streams had "a high percentage of normal butane, greater than 90 percent by volume." (PES Depo. 39:24-40:13.) While their primary use was in "the isomerization units to be converted to isobutane," (*id.*), some of the normal butane was "sent into the blending butane pool" stored in "the butane spheres." (PES Depo. 40:14-41:8.) The mixed-butane streams had a far "lower percentage of normal butane" (PES Depo. 39:24-40:13.) Notably, PES characterized the "mixed butane" not as butane at all, but rather as a "C5/C6 mix," *i.e.,* a mixture of pentane (C5), hexane (C6) and their isomers. (Ex. 3 at 2.)

In addition to producing normal butane and mixed butane at the refinery, PES bought butane from third parties that it added to the blending-butane spheres. (PES Resp. Int. 4. [Dkt. 50-22 at A-686].) Approximately 77% of the mixed butane and normal butane that PES blended into gasoline was refined from crude oil in the PES refinery itself, and the remaining 23% was purchased from third parties. (PES Resp. Int. 5 [Dkt. 50-22 at A-687–A-688]). "The large majority of the purchased butane was a normal butane stream." (PES Depo. 48:21-49:6.)

**C.    The production of refined gasoline products by PES**

PES made its refined products from "a variety of different components" in order to "meet the specifications as set by the EPA." (PES Depo. 34:20-35:1.) Those "detailed" specifications

included requirements regarding octane, volatility, distillation, and corrosion-rating, among other things. (*Id.* 37:23-38:8.) PES had "no standard recipe" for its CBOBs and RBOBs, and there was "no set requirement from a regulatory perspective" on the specific components they needed to include. (*Id.* 34:16-35:1, 37:1-7.) Blending butane was one of the "blend component options" that PES used when it produced those refined products. (*Id.* 35:19-23.) Other blend stocks that PES used included: heavy catalytic gasoline, alkylate, light catalytic gasoline, reformate, raffinate, and naphtha. (*Id.* 36:12-24; PES, Gasoline Blending October 2017, at 10 [Ex. 4].)

The quantity of blending butane and other components that PES used were set by "the Optimization Team" and "changed on a daily basis." (PES Resp. Int. 1 [Dkt. 50-22 at A-665].) In developing blending recipes to "maximize [its] profit margin," PES tried to meet EPA regulatory specifications "for the least amount of raw material cost." (PES Depo. 35:2-13.) Butane was "a very inexpensive component" (*id.* 35:14-18), and PES had "a significant economic incentive" to "blend[] butane into the gasoline pool." (Ex. 3 at 23.) Between 2014 and 2017, butane had the *lowest* cost of all gasoline blend stocks that PES used in its blending recipes. (PES Depo. 155:8-156:5; Ex. 4 at 10.) Due to the very low cost of its blending butane, PES "formulated the daily recipe to maximize the amount of butane that could be blended." (PES Resp. Int. 1 [Dkt. 50-22 at A-665].) Thus, even though EPA regulatory specifications reduced the quantity that PES could use in summer months (*id.* at A-666–A-667), blending butane still comprised 8% of the blending components PES used in the "summer gasoline pool," with higher percentages in winter months "due to the specification change." (Ex. 4 at 10; PES Depo. 153:16-155:4.)

PES first learned of the tax-scheme promotion to claim alternative fuel mixture credits for butane used to produce gasoline in April of 2017, and thus those tax credits could not have affected the amount of butane it used previously. (PES Resp. Int. 2 [Dkt. 50-22 at A-669].) But

even afterwards, the possibility of those tax credits "did not change the way [the] organization functioned," and "did not affect the amount of butane that the PES refinery blended into gasoline." (Eggert Depo. 130:4-130:10.)

**D.      The alternative fuel mixture credits claimed by PES.**

In August 2012, PES filed IRS Form 637, "Application for Registration (For Certain Excise Tax Activities), in which it registered for activity "M" (as a "[b]lender of gasoline, diesel fuel . . . or kerosene") and identified the "products bought or produced for blending" as "[e]thanol and [b]iodiesel." (Exs. 5, 6.) PES did not then register for activity "AM," as an "[a]lternative fueler that produces an alternative fuel mixture," nor identify butane as a product it bought or produced for blending. (*Id.*) On the twelve excise-tax returns PES originally filed for 2014 through 2016, it did not claim alternative fuel mixture credits. (*See* Dkts. 50-3–50-14.)

After learning of the tax-credit scheme in April 2014, PES filed a new IRS Form 637, in which it registered for activity "AM" for the first time, claiming that it "produce[d] an alternative fuel mixture of liquefied petroleum gas (including butane) and gasoline." (Ex. 7.) PES also filed an amended excise-tax return for the first quarter of 2014, which claimed that its gasoline was an alternative-fuel mixture eligible for the credit in § 6426(e). (*See* Dkt. 50-3.) On finalizing claims for 2014 through 2016, PES executive leadership expressed surprise and elation at what PES viewed as a windfall of over $400 million. (Ex. 8.) In July 2017, PES filed amended returns for the remainder of 2014, plus all quarters of 2015 and 2016. (*See* Dkts. 50-4–50-14.)

The IRS denied the application for "AM" registration on September 15, 2017. (Ex. 9.) On November 17, 2017, the IRS rejected an appeal by PES of the denial, stating that because butane is a taxable fuel and not an alternative fuel, "butane and gasoline mixtures are not alternative fuel mixtures for purposes of the alternative fuel mixture credit." (Ex. 10.)

-18-

When PES mixed blending butane with other gasoline blend stocks in 2017, the alternative fuel mixture credit was not then in effect, having expired on December 31, 2016. 129 Stat. at 3075. Thus, PES did not claim the credit on its original excise-tax returns for the first through fourth quarters of 2017. (*See* Dkts. 50-11–50-14.) On February 9, 2018, Congress reinstated the tax credit retroactively for the period between January 1, 2017 and December 31, 2017. 132 Stat. at 152. Afterwards, on October 16, 2008, PES filed one amended excise-tax return for all four quarters of 2017, claiming the credit for its "use of liquefied petroleum gas ('LPG') to create alternative fuel mixtures." (Dkt. 50-44.)

## ARGUMENT

**A.    Butane is a "taxable fuel" and not an "alternative fuel" with respect to the alternative fuel mixture credit under § 6426(e).**

Statutory interpretation necessarily begins with the text of the statute. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). In particular, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (citation omitted). Thus, while courts will examine "the text itself," they also consider "the context in which the language is used, and the statutory scheme as a whole." *Sunoco, Inc. v. United States*, 908 F.3d 710, 715 (Fed. Cir. 2018) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)), *cert denied*, 140 S. Ct. 46 (2019).

As the Federal Circuit recognized, the meaning of a statute "does not turn solely on dictionary definitions of its component words," and courts "cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme." *BASR Partnership v. United States*, 795 F.3d 1338, 1343 (Fed. Cir. 2015) (quoting *Yates v.*

-19-

*United States*, 574 U.S. 528, 537 (2015)). Rather, a "word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *see, e.g.*, *United States v. Wells Fargo Bank*, 485 U.S. 351, 355-356 (1988) (interpreting the phrase "all taxation" in "context" and limiting it to "direct taxation").

Tax credits such as the alternative fuel mixture credit are "a matter of legislative grace, and taxpayers bear the burden of showing they are clearly entitled to them." *Sunoco, Inc. v. United States*, 129 Fed. Cl. 322, 331 (2016) (quoting *Schumacher v. United States*, 931 F.2d 650, 652 (10th Cir. 1991)), *aff'd*, 908 F.3d 710 (Fed Cir. 2018). They are "narrowly construed." *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009). Taxpayers claiming an exemption from taxation must prove more than doubt or ambiguity in the law, but must rather present a clearly defined entitlement founded on the plain language of a statute. *See United States v. Stewart*, 311 U.S. 60, 71 (1940); *Bank of Commerce v. Tenn.*, 161 U.S. 134, 146 (1896).

Relying on dictionary and petroleum-industry definitions of "liquefied petroleum gas," PES argues (at 13-18) that butane qualifies as an alternative fuel for the purpose of the tax credit. Two district courts have rejected that argument, and this Court should do so as well. In *Venture*, 448 F. Supp. 3d at 983-84, the district court held that "butane is a taxable fuel and therefore cannot be an alternative fuel for purposes of the alternative fuel mixture credit," based on the language of the Code and Treasury Regulations, "the context of the overall statutory scheme," and the statute's "purpose." In *Vitol*, 2020 WL 1442136 at *5, the district court likewise held that because "butane is a taxable fuel," it "is excluded from the term LPG in section 6426 and is not an alternative fuel for the purposes of section 6426(e)'s alternative fuel mixture credit." Those

holdings are well supported by the text and context of § 6426(e), Treasury's long-standing interpretation of the relevant terms, and the statute's purpose, as defendant will show.

### 1.    Text and context of § 6426(e)

The language of § 6426(e) is naturally read to preclude combinations of taxable fuels with each other from qualifying for the alternative fuel mixture credit. For the tax quarters at issue, § 6426 "allowed against the tax imposed by section 4081" a credit for each gallon of "alternative fuel" used to produce an "alternative fuel mixture." § 6426(a)(1), (e)(1). The Code defines "alternative fuel mixture" as a "mixture of alternative fuel and taxable fuel (as defined in subparagraph (A), (B), or (C) of section 4083(a)(1))" that the taxpayer used, or sold for use, as fuel. § 6426(e)(2). Each component of the definition of an alternative-fuel mixture—"mixture," "taxable fuel," and "alternative fuel"—makes clear that mixtures of butane with other gasoline blend stocks are ineligible for the alternative fuel mixture credit.

The word "mixture" connotes a combination of two "diverse" or "contrasting" elements. American Heritage College Dictionary at 892 (4th ed. 2002) [Ex. 52]; Random House College Dictionary at 856 (rev. ed. 1982) [Ex. 53]. Congress specified in § 6426(e) what the two different elements must be: a "taxable fuel" and an "alternative fuel."

It is clear that butane is a "taxable fuel." Section 6426(e) incorporates by reference the definition of "taxable fuel" from § 4083(a)(1). Section 4083(a)(1) defines "taxable fuel" as "gasoline," "diesel fuel," and "kerosene." § 4083(a)(1)(A), (B), (C). "Gasoline" is defined to include "any gasoline blend stock" identified by Treasury in regulations. § 4083(a)(2)(B)(i). And since 1992, Treasury's regulations specifically identified "butane" as a gasoline blend stock. Reg. § 48.4081-1(c)(3)(i)(B). Thus, butane is a "taxable fuel," specifically "gasoline," for the purpose of § 6426(e). *See Venture*, 448 F. Supp. 3d at 983 (holding that "butane is a taxable

fuel," because "'taxable fuels' means gasoline as well as gasoline blends, gasoline blend stocks, and any product commonly used as an additive in gasoline.")

As a result of this express statutory language, the CBOBs and RBOBs that PES produced do not qualify as "mixtures" within the meaning of § 6426(e). When PES blended its "butane" with other gasoline blend stocks, it was not combining the two diverse elements contemplated by § 6426(e); it was combining one taxable fuel (butane, a gasoline blend stock) with other taxable fuels (catalytic gasoline, alkylate, reformate, raffinate, and naphtha, also gasoline blend stocks). Because the statute defines gasoline blend stocks to be "gasoline," PES combined gasoline with gasoline. And blending gasoline with gasoline does not create an alternative fuel mixture.

In addition, the term "alternative fuel" supports treating butane as a taxable fuel rather than an alternative fuel for the credit. Such fuel must be an "alternative" to—not the same as—a taxable fuel. *See, e.g.,* American Heritage Dictionary at 54 (4th ed. 2000) [Ex. 54] (defining "alternative" as "the choice between two mutually exclusive possibilities"). If a substance is a taxable fuel—as butane is by statute and regulation—then treating that same substance as an alternative fuel would be contrary to the common meaning of "alternative."

Moreover, the prior "understood meaning" of "alternative fuel" as used in § 4041 provides critical background context for interpreting that same term in § 6426(d)(2), and more precisely, the term "liquefied petroleum gas," the statutory subset of "alternative fuel" at issue here. *See Wells Fargo*, 485 U.S. at 355-356. Since 1954, § 4041(a)(2) and its predecessors identified alternative/special motor fuels by reference to fuels that are not taxable under § 4081, establishing that the two types of fuel are mutually exclusive, and they referred to LPG as an alternative/special motor fuel, establishing that "liquefied petroleum gas" does not encompass taxable fuels. *See* Excise Tax Reduction Act of 1954, 68 Stat. at 44 (imposing the special-motor-

fuels tax on, among other things, "liquefied petroleum gas, or any other liquid (other than . . . any product taxable under [the predecessor of §4081])"); § 4041(a)(2)(A), (B)(ii).[13]

Nothing in § 6426(d)(2) overrides that fundamental dichotomy or LPG's place within it. Rather, the language and operation of § 6426 reflect that orthodoxy. If a taxpayer qualifies for the credit in § 6426(d) for alternative fuels (including LPG) used for transportation, that credit is allowed against the tax imposed by § 4041, not the tax imposed by § 4081. § 6426(a)(2). That specific allowance in § 6426 manifests the long-standing rule under § 4041 that alternative fuels like LPG do not include fuels subject to tax under § 4081 (like butane).[14] Indeed, when Congress enacted § 6426(d) in 2005, it revised the heading in § 4041(a)(2), changing it from "special motor fuels" to "alternative fuels" to better align the two sections. SAFETEA, 119 Stat. at 1946.

Finally, the manner of calculating the tax on LPG under § 4041 and the related credit under § 6426(d) further confirms the integral relationship between § 4041 and § 6426, and the understanding of Congress that butane is not an LPG (and not an alternative fuel) under either section. In 2015, Congress changed how the tax on LPG is calculated, applying the per-unit tax rate to the quantum of LPG that is the "energy equivalent of a gallon of gasoline" (defined as 5.75 pounds of LPG). Surface Transportation & Veterans Health Care Choice Improvement Act of 2015, P.L. 114-41, § 2008(a), 129 Stat. 443, 459 (codified at § 4041(a)(2)(B)(ii) & (C)). Later that year, Congress made a corresponding amendment to § 6426, ensuring that the credits involving LPG are determined in the same manner as the tax. *See* § 6426(j)(1).

---

[13] After 1996, § 4041(a)(2) has referred to LPG in subparagraph (B) ("Rate of tax") rather than in the first sentence of § 4041(a)(2). *See* Taxpayer Relief Act of 1997, P.L. 105-34, § 907(a)(1), 111 Stat. 788, 875.

[14] If, as a general proposition, a substance could be both an alternative fuel and a taxable fuel, then logically the credit provided in § 6426(d) would be allowed against whichever tax is imposed on that substance (the § 4041 tax, the § 4081 tax, or both).

In computing the LPG/gasoline conversion rate (5.75 pounds of LPG per gallon of gasoline), Congress relied on their relative "energy contents" as determined by the Energy Department (83,500 Btu/gallon for LPG and 115,400 Btu/gallon for gasoline).[15] Notably, the Energy Department report that Congress relied on provided *separate* (and different) energy contents for "liquefied petroleum gas (LPG)" and for "butane." *See* Oak Ridge Nat'l Labs. Data Transp. Energy Data Book, Table B.4, Heat Content for Various Fuels (Edition 32) (2013) [Ex. 55] (providing that "butane" has an energy content of "93,000 Btu/gal"). Thus, not only did Congress tie the application of § 4041 and § 6426 to each other, but it also recognized that butane and liquefied petroleum gas are not one and the same.

### 2.    Treasury's longstanding interpretation of the statutory terms

When Congress enacted the original alternative fuel mixture credit in 2005, it did so against the backdrop of Treasury's longstanding definitions of alternative/special motor fuel and gasoline. As the Supreme Court long ago held, Treasury's "administrative definition is 'highly relevant'" to statutory interpretation and provides critical background context. *Better Business Bureau of Washington, D.C. v. United States*, 326 U.S. 279, 286 (1945). It recently confirmed this point. *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 898-899 (2019) (adopting plain reading of statute that was "[i]n line with . . . the IRS's long held construction" and relying on the fact that the IRS's "understanding [of the statutory terms] has governed for more than eight decades").

Treasury first issued regulations defining "special motor fuel" in November 1960. 25 Fed. Reg. 11217, 11220-11221 (1960). Consistent with the statute, the regulatory definition

---

[15] *See* Joint Comm. on Tax'n, *Description of the Chairman's Mark of a Proposal to Convert the Tax on Liquefied Natural Gas and Liquefied Petroleum Gas to an Energy Equivalent Basis*, JCX-32-15, at 2-3 & n.6 (2015) (citing Oak Ridge Nat'l Labs. Data Transp. Energy Data Book (Edition 32) (2013); *accord* Joint Comm. on Tax'n, *Gen'l Explanation of Tax Legislation Enacted in 2015*, JCS-1-16, at 36 (tax), 308 (credit) (2016); § 4041(a)(2)(C) (incorporating the 115,400 figure for gasoline).

expressly included LPGs and excluded "any product taxable under the provisions of section 4081." 26 C.F.R. § 48.4041-7(f)(1)(i)&(2) (1961).[16] And since 1992, Treasury has identified "butane" as a "gasoline blend stock" that is taxable under § 4081. Reg. § 48.4081-1(c)(3)(i)(B); 57 Fed. Reg. 32424 (1992); *see* § 4083(a)(2)(B)(i). These regulations provided context for the 2005 enactment of the alternative fuel mixture credit.

Similarly, Treasury confirmed fourteen years ago—in the context of the alternative fuel mixture credit—that "alternative fuel" means something "other than" a "taxable fuel." *See* Notice 2006-92, § 6(a) ("A liquid alternative fuel . . . is a liquid other than gas oil, fuel oil, or taxable fuel . . ."). Treasury made no exception in Notice 2006-92 for butane or any other gasoline blend stock. Notice 2006-92 (as well as the relevant regulations) provided context for the seven subsequent reenactments of the alternative fuel mixture credit (*see*, above, n.6), including the reenactments relied on by PES in its refund claims filed in 2017 and 2018.

Congress has never overruled Treasury's regulations or public guidance in this area, despite amending § 6426(e) and the related Code provisions many times. Although not dispositive, Treasury's long-standing interpretation of the statutory terms is highly relevant to interpreting § 6426(e) because "it is rare that error [in an agency's interpretation of the statute it administers] would long persist." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740 (1996).

---

[16] Unlike the statute, the regulation added the parenthetical "(such as propane, butane, or pentane, or mixtures of the same)" after the term "liquefied petroleum gases." 26 C.F.R. § 48.4041-7(f)(1)(i) (1961). Properly read with paragraph (f)(2), the 1960 regulation signified that, for purposes of § 4041, LPGs included butane unless butane was subjected to taxation under § 4081. As discussed above, Congress subjected butane to taxation under § 4081 in 1986 when it expanded the definition of "gasoline" to include "any gasoline blend stock," *i.e.,* "any petroleum product component of gasoline." § 4083(a)(2)(B)(i) & flush language. We note that when Treasury last amended the regulation in 1995, it reinforced the primacy of paragraph (f)(2) by inserting the clause "Except as provided in paragraph (f)(2) of this section" before the definition of "special motor fuel" in paragraph (f)(1). 60 Fed. Reg. 40079, 40081-82 (1995); *see* Reg. § 48.4041-8(f).

Congress has had decades to supersede Treasury's understanding of the excise-tax provisions corresponding to the § 6426(d) and § 6426(e) credits but has taken no steps to do so, despite amending §§ 4041, 4081-4083, and 6426 multiple times. "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (citation omitted). As in the Supreme Court's recent decision in *Loos*, Treasury's long-held interpretation properly informs the Court's understanding of the statutory text.

Far from overriding Treasury's longstanding, consistent interpretations, Congress expressly recognized them when enacting and reenacting the alternative fuel mixture credit over the years. For example, the Conference Report to the 2005 law enacting the credit noted that "butane" was identified in Treasury Regulations as a "gasoline blend stock" and thus "gasoline," a "taxable fuel." H.R. Rep. 109-203 at 1215-1216 & n.300 (citing Reg. § 48.4081-1(c)(3)(i)); *see also* Joint Comm., JCX-23-10, at 30 & n.15 (citing Notice 2006-92); Joint Comm. on Tax'n, *Gen'l Explanation of Tax Legislation Enacted in the 111th Congress*, JCS-2-11, at 368 n.989 (2011) (same); Joint Comm., JCS-1-16, at 36 (same).[17]

Gasoline producers apparently also relied on Treasury's long-standing guidance. During the first decade that the alternative fuel mixture credit was available, such taxpayers did not

---

[17] "Blue Books are prepared by the staff of the Joint Committee on Taxation for the purpose of providing a single, comprehensive source of legislative history for major tax acts." *AD Global Fund, LLC v. United States*, 67 Fed. Cl. 657, 677 n.16 (2005) (internal quotations and brackets omitted). Blue Books are not technically legislative history, but courts nevertheless recognize that they are "highly indicative of what Congress did, in fact, intend." *Alfaro v. Commissioner*, 349 F.3d 255, 230 n.19 (5th Cir. 2003) (quoting *Estate of Hutchinson v. Commissioner*, 765 F.2d 665, 670 (7th Cir. 1985); *see also Principal Mut. Life Ins. Co. v. United States*, 295 F.3d 1241, 1247 (Fed. Cir. 2002) (relying in part on the 1994 Blue Book in construing § 811(d)).

claim that the use of butane in gasoline production qualified for the credit. 165 Cong. Rec.
S7185. Then, a decade after Notice 2006-92 was issued, they began doing so, claiming that the
blending of two taxable fuels (butane and gasoline) qualifies. H.R. Rep. 116-379 at 61. In
response, Treasury issued Revenue Ruling 2018-2, which applied Notice 2006-92 to butane
specifically, and concluded that, like all other taxable fuels, butane does not qualify as an
alternative fuel for the alternative fuel mixture credit. Rev. Rul. 2018-2, 2018-2 I.R.B. 277. As
the district court recognized in *Vitol*, that ruling further supports the Government's position.
2020 WL 1442136, at *3-5 (holding that Rev. Rul. 2018-2 "is reasonable, thorough, and not
inconsistent with prior IRS pronouncements," and affording it "significant weight").

The Joint Committee on Taxation recognized the correctness of Revenue Ruling 2018-2,
relying on it to explain the correct operation of the alternative fuel mixture credit. *See* Joint
Comm., JCX-5-18, at 11 n.37 (stating that "mixtures of butane and gasoline are not alternative
fuel mixtures and do not qualify for the alternative fuel mixture credit under section 6426(e)")
(citing Rev. Rul. 2018-2); Joint Comm., JCX-8-19, at 14 n.52 (same). Indeed, when Congress
clarified the credit in 2019, the proponent of the original 2005 law (Senator Grassley)
emphasized that the "IRS got the law correct when it issued Revenue Ruling 2018-2, and our
clarification makes clear that it is our intent for the IRS interpretation of the law to be controlling
for all claims" seeking the alternative fuel mixture credit. 165 Cong. Rec. S7185.

### 3.    Purpose of the alternative fuel mixture credit

The Supreme Court has cautioned courts not to "interpret federal statutes to negate their
own stated purposes." *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973);
*see also King v. Burwell*, 576 U.S. 473, 498 (2015) ("Congress passed the [ACA] to improve
health insurance markets, not to destroy them. If at all possible, we must interpret the Act in a
way that is consistent with the former, and avoids the latter."); *Star-Glo Assocs., LP v. United*

*States*, 414 F.3d 1349, 1357 (Fed. Cir. 2005) (rejecting construction that would "undermine[]" the statute's purpose). The interpretation of § 6426 proposed by PES tramples on the legislative purpose of the credit: "to reduce U.S. reliance on conventional gasoline" by encouraging "the use and development of alternative motor fuels as substitutes for traditional motor fuels" like gasoline. H.R. Rep. 116-379 at 61-62.

Treating butane as an alternative fuel is inconsistent with the "purpose" of § 6426(e), as the district courts in *Venture* and *Vitol* correctly recognized. *Venture*, 448 F. Supp. 3d at 983; *Vitol*, 2020 WL 1442136, at *5. For over thirty years, Congress has defined gasoline to include gasoline blend stocks, and Treasury has identified butane as a blend stock, not an alternative to gasoline. Blending butane when producing gasoline does not generate a gasoline alternative. Rather, it is simply how the petroleum industry has produced gasoline for decades. Blend stocks are traditionally used to produce gasoline, which is why they are included within the statutory and regulatory definitions of gasoline for excise-tax purposes. As the district court in *Vitol* astutely observed, the "name of the alternative fuel mixture credit alone implies that Congress intended to incentivize the production of alternative fuels, not traditional fuels. . . There is nothing 'alternative' about traditional gasoline." 2020 WL 1442136, at *5.

The contention by PES (at 38-39) that adding butane to gasoline serves the credit's purpose is wrong. Gasoline blend stocks are included within the definition of gasoline because they are a "component" of—not an alternative to— "gasoline." § 4083(a)(2) (flush language). Blending butane is a standard step in the production of gasoline and has been so for decades. As the EPA explained when it issued regulations limiting butane use in warmer months, "[b]utane is a blendstock that historically has been blended with gasoline, particularly in the wintertime," and such blending "constitutes the production of gasoline." 70 Fed. Reg. 74552, 74558 (2005).

-28-

Moreover, the suggestion (at 39) that Congress wanted "to incentivize taxpayers to increase the amount of butane they mix with gasoline" has no support either in the legislative history or the reality of the gasoline industry. Gasoline producers add butane to increase vapor pressure in the winter months and, because butane is cheaper than all other gasoline blend stocks, to increase their profits. However, the amount of butane that producers may use is limited by EPA pollution restrictions. *See Sunoco Partners Mktg. & Terminals v. U.S. Venture*, No. 15-C-8178, 2017 WL 4283946, at *1 (N.D. Ill. 2017) (observing that the EPA limits the butane that may be blended into gasoline because "adding butane to gasoline increases the volatility of the blended gasoline," and "gasoline with higher volatility contributes to smog"). Even without an alternative fuel mixture credit, gasoline manufacturers already have every incentive to maximize the butane they use, limited only by EPA regulations that a tax credit cannot overcome.

That the claims by PES does not serve the credit's purpose is confirmed by Congress's recent clarification of the statute. In 2019, Congress clarified § 6426(e) in response to "promotional literature" urging taxpayers to claim that blending butane with gasoline qualifies for the credit, even though butane is "a standard component chemical present in all gasoline." H.R. Rep. 116-379, at 61. This promotion was "not consistent with Congressional intent" because the purpose of the credit is to "subsidize fuel capable of being used as a substitute for traditional motor vehicle fuel," because the "use of butane as an ingredient in gasoline predates the enactment of the alternative fuel mixture credit by many years," and because "Congress never intended to incentivize such a widespread and established practice in the production of conventional gasoline." *Id.* at 61 & n.182. In other words, Congress clarified § 6426 precisely because using butane to produce gasoline does not serve the credit's purpose.

In arguing that the Court should consider the purpose and context of § 6426(e), defendant is not asking the Court to disregard the "statute's plain language" based on "tax policy alone," as PES charges (at 25-26). Rather, consistent with binding precedent, defendant merely asks the Court to interpret the language of § 6426 in its proper context and consistent with the statute's purpose. *See Dolan*, 546 U.S. at 486.

**4.     The counterarguments by PES lack merit.**

The plain language, context, and purpose of § 6426(e) evidence the intent of Congress to treat butane mixed with other gasoline blend stocks as a taxable fuel (gasoline) and not as an alternative-fuel mixture eligible for the tax credit. The contrary arguments by PES are meritless.

*First*, PES argues (at 18-25) that the Court should divorce its interpretation of the terms "taxable fuel" and "alternative fuel" in § 6426 from the meaning of taxable fuels and alternative/ special motor fuels in the excise-tax statutes, §§ 4041 & 4081. But PES ignores the fact that § 6426(e) expressly incorporates by reference the definition of "taxable fuel" from § 4083(a)(1), and the alternative fuel mixture credit cannot be properly understood without that reference. Although PES asserts the credit for producing what it refers to as "a mixture of butane and gasoline" (Dkt. 12, ¶ 16), PES did *not* mix butane and gasoline together. Rather, PES mixed its own "blending butane" with various gasoline blend stocks—catalytic gasoline, alkylate, reformate, raffinate, and naphtha—creating the refined products known as CBOBs and RBOBs. While the other gasoline blend stocks do constitute taxable fuels for the purpose of § 6426(e), it is only *because* of the cross-reference to § 4083(a)(1). PES may not have it both ways. It may not rely on the treatment of the other gasoline blend stocks as "gasoline" under § 4083(a)(1) but then disregard the same cross-reference when it comes to butane.

In an attempt to break the strong link between the meaning of "alternative fuel" in § 6426 and alternative/special-motor fuels under the excise-tax scheme, PES constructs a strawman

argument (at 20-23) regarding butane produced from natural gas. According to PES, butane

produced from crude oil constitutes a taxable fuel, but butane produced from natural gas does

not, because it is supposedly not "a petroleum product component of gasoline" under § 4083(a).

But "petroleum" is not just "crude oil," as PES asserts without evidence (at 20). As "a technical

term, petroleum also includes natural gas." Encyclopedia Britannica, *Petroleum*. The Energy

Department defines "petroleum" as a "broadly defined class of liquid hydrocarbon mixtures"

such as "natural gas plant liquids," which include, among other things, butane "separated" at

"natural gas processing, fractionating, and cycling" plants. EIA, *Glossary* (definitions of

"petroleum" & "natural gas plant liquids"). It further defines "petroleum products" to include

products "obtained from the processing of . . . natural gas."[18] EIA, *Glossary.* Thus, PES is wrong

to suggest that butane produced from natural gas is not a "taxable fuel" under § 4083.

Regardless, any attempt by wordplay to exclude natural gas liquids from the meaning of

the term "petroleum" would necessarily also apply to the term "liquefied petroleum gas." If, as

PES asserts, petroleum refers to crude oil but not natural gas, then butane derived from natural

gas would not qualify as liquefied *petroleum* gas, and its blending with other gasoline blend

stocks would not qualify for the alternative fuel mixture credit under PES's argument.

PES's reliance (at 22-23) on the flush language of § 6426(d)(2) is also misplaced. That

language lists certain fuels that would otherwise qualify as alternative fuels under § 6426(d)(2)

but are specifically excluded.[19] The fact that butane is not listed does not help PES. Unlike

_____

[18] *See also* EIA, FAQs, *What is the Difference Between Crude Oil, Petroleum Products, and Petroleum?* [Ex. 28] ("Petroleum products are produced from the processing of crude oil and other liquids at petroleum refineries, from the extraction of liquid hydrocarbons at natural gas processing plants, and from the production of finished petroleum products at blending facilities. Petroleum is a broad category that includes both crude oil and petroleum products.").

[19] When it enacted § 6426(d) in 2005, Congress excluded ethanol, methanol, and biodiesel from the definition of "alternative fuel" because those fuels were the subject of pre-

butane, none of those listed fuels are expressly included within the definition of "gasoline" or any other "taxable fuel."[20] There was no need to include butane on that list, since it was already excluded from the scope of alternative fuels as a fuel that is taxable under § 4081. As explained above, when Congress enacted § 6426(d)(2) (defining alternative fuel), § 4041 and Reg. § 48.4041-8(f) already excluded taxable fuels—including, pursuant to § 4083(a)(2)(B)(i) and Reg. § 48.4081-1(c)(3)(i)(B), butane—from the scope of alternative fuels. To exclude butane again in § 6426(d)(2) would be redundant.

**Second**, it is not correct that a fuel may be both a taxable fuel and an alternative fuel under § 6426(e), as PES suggests (at 31-37). Nothing in the text of § 6426(d)(2) expressly permits a fuel to be both a taxable fuel and an alternative fuel. The request that the Court read such a dual classification into the language of the credit conflicts with the long-standing canon of construction that tax credits and other benefits provided in the Code are matters of legislative grace and, as such, must be construed narrowly and allowed only where clearly provided for. *See Sunoco, Inc. v. United States*, 129 Fed. Cl. at 331.

Indeed, if Congress had in fact intended blends of butane with other gasoline blend stocks to qualify for the alternative fuel mixture credit, it would have had to enact an explicit provision to that effect that would override the existing rules to the contrary. This point is exemplified by

---

existing credit provisions enacted the prior year: § 6426(b) (ethanol and methanol) and § 6426(c) (biodiesel). American Jobs Creation Act of 2004, P.L. 108-357, § 301(a), 118 Stat. 1418, 1459. In 2010, Congress added "fuel . . . derived from the production of paper or pulp" to § 6426(d)(2)'s flush language to overrule Treasury's determination that a particular substance qualified for the alternative fuel mixture credit. Joint Comm. on Tax'n, *Technical Explanation of the Revenue Provisions Contained in the "American Workers, State, and Business Relief Act of 2010," as Passed by the Senate on March 10, 2010*, JCX-11-10, at 174 (2010).

[20] When methanol and ethanol are blended with gasoline, the resulting "gasoline blend" may fall within the definition of gasoline, § 4083(a)(2)(A), but, standing alone, neither is defined as a gasoline blend stock (and therefore gasoline) or any other taxable fuel.

the biodiesel mixture credit, which PES attempts (at 33-34) to analogize to the alternative fuel mixture credit (citing Notice 2007-37, 2007-1 C.B. 1002). Section 6426(c) provides a credit for mixing biodiesel and diesel fuel. Diesel fuel, as defined in Reg. § 48.4081-1(c)(2), includes renewable diesel fuel. Notice 2007-37, § 2(a)(3)(i). Congress expressly directed, however, that "renewable diesel fuel" should also be treated as "biodiesel" for the biodiesel mixture credit provided in § 40A and § 6426(c). § 40A(f)(1) (providing that "renewable diesel shall be treated in the same manner as biodiesel"); § 6426(c)(5) (incorporating § 40A). Thus, with the biodiesel mixture credit, Congress affirmatively permits a fuel (renewable diesel) to qualify under two different categories: diesel fuel under § 4083, and biodiesel under § 40A.

The same is not true with butane. As the district court explained in *Venture* when it rejected the same argument, "the IRS considers 'renewable diesel fuel' to be both a biodiesel and a diesel fuel" because "Congress authorized such dual treatment," but Congress did not authorize such dual treatment for butane (*i.e.,* as both gasoline and alternative fuel). 448 F. Supp. 3d at 984. Indeed, it was not until almost a decade after Notice 2007-37 was published that taxpayers started claiming the alternative fuel mixture credit for the use of butane to produce gasoline and arguing that the analysis in that Notice applies to those wholly different circumstances.

Moreover, the biodiesel-mixture argument conflicts with the express language of Notice 2006-92, which—unlike Notice 2007-37—addresses the alternative fuel mixture credit. Notice 2006-92 provides that "alternative fuel" does not include any liquid that is "taxable fuel." Notice 2006-92, § 6(a). And, as noted above, Notice 2006-92 has not only survived multiple amendments to § 6426(e), but has actually been cited in congressional documents relating to those amendments. Read together, the two Notices establish that, "[a]bsent an unambiguous

grant from Congress" like that set out in § 40A(f)(1) and § 6426(c)(5), "the terms 'alternative fuel' and 'taxable fuel' cannot include the same fuels." *Venture*, 448 F. Supp. 3d at 984.

PES is also wrong (at 34-37) that defendant's position would "vitiate three other expressly-defined alternative fuels." PES cites § 6426(d)(2)(F) & (G), which describe fuels derived from biomass. With no supporting admissible evidence, PES contends that biomass-derived fuel may include hexane and pentane, which would be both alternative fuels and taxable fuels, because hexanes and pentanes are listed as gasoline blend stocks in Reg. § 48.4081-1(c)(3)(i). However, biomass is defined in § 45K(c)(3) to mean "any organic material other than – (A) oil and natural gas (or any product thereof), and (B) coal (including lignite) or any product thereof." If hexane and pentane are truly derived from biomass, then by definition they cannot be derived from oil and natural gas, § 45K(c)(3)(A). And if they are not derived from oil and natural gas, then they cannot qualify as gasoline blend stocks, which only include "petroleum product[s]." § 4083(a)(2) (flush language).

Likewise, "liquid fuel derived . . . from coal (including peat) through the Fischer-Tropsch process" would not be a taxable fuel under the government's position, as PES asserts (at 36). PES fails to cite any statute or regulation that states specifically that Fischer-Tropsch fuels are taxable fuels, unlike petroleum-derived butane, which is explicitly listed as a gasoline blend stock and is therefore a taxable fuel. § 4083(a)(2)(B)(i); Reg. § 48.4081-1(c)(3)(i)(B). Nor does PES cite any occasion where such fuels have been treated as taxable fuels subject to tax under § 4081. PES ignores that Congress: (1) intended such fuels to be taxed as alternative fuels under § 4041, which expressly taxes "any liquid fuel . . . derived from coal," § 4041(a)(2)(B)(iii); and, (2) has provided a credit against the tax imposed under § 4041 (not § 4081) for the sale or use of Fischer-Tropsch fuels in motor vehicles, § 6426(a)(2).

In addition, PES failed to show as a factual matter that Fischer-Tropsch fuels qualify as the taxable fuels gasoline, diesel fuel, or kerosene.[21] Moreover, shortly after Congress enacted the alternative fuel mixture credit, Treasury issued guidance under the new provision that expressly defines "liquid alternative fuel" in a manner that excludes "taxable fuel." Notice 2006-92, § 6(a)(1). It has never qualified that definition to account for any of the alternative fuels referenced by PES. Nor has Congress, despite having amended § 4041 and § 6426 many times.[22]

**B.    As used in § 6426(d)(2), "liquefied petroleum gas" refers to propane autogas, an alternative motor fuel used in the United States, and *not* to a broad category of gases that includes butane.**

**1.    Congress equates "liquefied petroleum gas" with propane.**

Over the years, Congress has consistently used the terms "liquefied petroleum gas" and "propane" interchangeably, and it did so repeatedly in the legislative history of SAFETEA, which enacted the alternative fuel mixture credit in § 6426(e). When Congress first considered enacting "tax credits for alternative fuels" in 2005, it did so from the perspective that the term LPG connotes propane. *See* Joint Comm. on Tax'n, *Description of the "Energy Policy Tax Incentives Act of 2005,"* JCX-44-05, at 45-46 (2005) (referring to "[l]iquefied petroleum gas (propane)"). And congressional committees continued to recognize the equivalence of LPG and propane throughout the process of debating and enacting the alternative fuel mixture credit. *See, e.g.,* S. Rep. 109-82 at 4 n.4 (2005) [Ex. 55] (referring to "[l]iquefied petroleum gas (propane)");

---

[21] The only evidence that PES offers regarding Fischer-Tropsch fuels (at 36) is an inadmissible excerpt of a lesson plan from an academic's webpage.

[22] The reference by PES (at 36 n.31) to the alcohol fuel mixture credit under § 6426(b) is likewise irrelevant. The alcohol fuel mixture credit, expired since 2011, differed from the alternative fuel mixture credit, and it was governed by different rules. To qualify as "alcohol," a substance could not be produced from petroleum, and ETBE produced from petroleum-derived alcohol therefore did not qualify for that credit. § 6426(b)(A)(4). At the same time, ETBE produced from non-petroleum derived alcohol was not taxable as a gasoline blend stock, because it did not satisfy the petroleum-product-component requirement of § 4083(a)(2).

H.R. Rep. 109-203 at 1119 (same); Joint Comm. on Tax'n, *Gen'l Explanation of Tax Legislation Enacted in the 109th Congress*, JCS-1-07, at 70, 92 (2007) (same).

Congress has continued to refer to liquified petroleum gas and propane interchangeably in the years since it first enacted the tax credit. When Congress moved the reference to LPG in § 4041(a)(2) from the first sentence of that section to subparagraph (B) (*see*, n.9 above), the committee reports referred to "liquefied petroleum gas ('propane')." S. Rep. 105-33 at 73 (1997) [Ex. 56]; H.R. Rep. 105-220 at 444 (1997) (Conf. Rep.) [Ex. 57]. And Congress also equated liquefied petroleum gas with propane when it applied the per-unit tax rate on LPG to the quantum of LPG that is the energy equivalent of gasoline (discussed above at 23-24). *See* Joint Comm., JCX-32-15, at 2 ("Liquefied natural gas (''LNG'') and liquefied petroleum gas (also known as propane) are classified as alternative fuels."); Joint Comm. on Tax'n, *Description of the Chairman's Modification to the Chairman's Mark of a Bill to Extend Certain Expired Tax Provisions*, JCX-103-15, at 9 (2015) (same); Joint Comm, JCS-1-16, at 36 (same).

Congress has repeatedly expressed the view that "liquefied petroleum gas" and "propane" are one and the same. Congress necessarily intended LPG in § 6426(d)(2) to mean the propane-based LPG used as an alternative motor fuel in the United States, *i.e.,* propane autogas.

**2.     In the alternative-fuel context, LPG means propane autogas, not butane.**

In the United States, the alternative fuel known as "liquefied petroleum gas," or "LPG," has a very specific meaning: *propane autogas*, a common alternative motor fuel. Propane used in vehicles is known as HD-5 propane. AFDC, *Propane Fuel Basics* [Ex. 29]. HD-5 propane "must consist of at least 90% propane, no more than 5% propylene, and 5% other gases, primarily butane and butylene." (*Id.*)

A decade before Congress enacted § 6426(e), the Energy Department recognized that "[b]ecause the current U.S. standards restrict automotive LPG to being mostly propane, LPG

automotive fuel is frequently referred to as propane." EIA, *Alternatives to Traditional Transportation Fuels: An Overview*, 53 (1994) [Ex. 30]. The Energy Department components with alternative-fuel responsibility share the same understanding today.[23]

As PES notes (at 15), an Energy Information Administration glossary defines the *plural* "liquefied petroleum gases" to include butane, among other hydrocarbons. EIA, *Glossary*. But that Glossary does not define the *singular* LPG, which refers to a particular fuel product and not a general category of gases, nor does the Glossary define LPG in the context of alternative fuels. Notably, in other publications, the EIA specified that "when speaking of alternative fuels, the terms LPG and propane are often used interchangeably" and that "LPG for vehicular use is a mixture containing at least 90 percent propane." Mary Joyce, EIA, *Developments in U.S. Alternative Fuel Markets* (2000) [Ex. 34]; *see also* EIA, *Alternative Fuel Vehicle Data: Definitions, Sources and Explanatory Notes*, 1 (2019) [Ex. 35] (defining "alternative fuels, for transportation applications" to include "[l]iquefied petroleum gas (propane)").

Other federal agencies also recognize that LPG is synonymous with propane in the context of alternative motor fuels. For example, when the Transportation Department identified

---

[23] *See, e.g.,* AFDC, *Propane Fuel Basics* (explaining that "[l]iquefied petroleum gas (LPG)" is also known as "propane autogas," and is a "clean-burning alternative fuel that's been used for decades to power light-, medium, and heavy duty propane vehicles."); AFDC, *Propane Vehicles* ("Propane, also known as liquefied petroleum gas (LPG), or propane autogas, is considered an alternative fuel under the Energy Policy Act of 1992); Office of Energy Efficiency & Renewable Energy, Dep't of Energy, www.fueleconomy.gov, *Propane: Liquefied Petroleum Gas (LPG)* [Ex. 31] ("Propane, or liquefied petroleum gas (LPG), is a clean-burning fossil fuel that can be used in internal combustion engines."); Office of Energy Efficiency & Renewable Energy, Dep't of Energy, *State & Alternative Fuel Provider Fleets: Key Transportation Terminology* [Ex. 32] ("identifying alternative fuels defined by the Energy Policy Act of 1992 to include "[l]iquefied petroleum gas (propane)"); Oak Ridge National Laboratory, Dep't of Energy, History of Significant Vehicle and Fuel Introductions in the United States, (2017) [Ex. 33] ("Propane is also known as liquefied petroleum gas and propane autogas. . . . There is continuing interest in propane as an alternative fuel due to an abundant domestic supply and significant vehicle and engine offerings.").

"alternative fuels being used in transportation," it stated that "propane" was "also known as liquefied petroleum gas." U.S. Dep't of Trans., *Fuels and Vehicle Technology* [Ex. 36]. And in regulations governing manufacturing incentives for alternative-fuel automobiles under 49 U.S.C. § 32901, *et seq.* (a statute defining "alternative fuel" to include "liquefied petroleum gas"), the Transportation Department referred to "Liquefied Petroleum Gas" as "Grade HD-5." 49 C.F.R. § 538.8. Likewise, when the Federal Trade Commission amended its octane-certification rule "to include alternative liquid automotive fuels, including . . . liquefied petroleum gas," the FTC recognized that "the terms 'LPG' and 'propane' are often used interchangeably, and that, of the "four grades" of LPG, HD-5 propane was "the grade usually recommended for automotive use." *See* Automotive Fuel Ratings, Certification, and Posting, 58 Fed. Reg. 41356, 41356-58 (1993).

PES itself recognizes that the petroleum industry sometimes uses the term "LPG" to refer to propane or propane-containing substances. For example, Stephanie Eggert, the former Director of Operations at the PES refinery, admitted that she "definitely ha[s] seen the term LPG" used as a "shorthand to reference just propane." (Eggert Depo. at 151:18-22.) In a "Production Book" that PES routinely used to track inventory, the abbreviation "LPG" referred to propane products.[24] And on its website, PES advertised a product called "liquefied petroleum gas." (Ex. 12). In response to a document request for the specifications of the "liquefied petroleum gas" referred to on the website, PES produced specific manufacturing specifications

---

[24] PES maintained a "Production Book" that tracked PES inventories of various refinery feedstocks and products (Eggert Depo. at 157:10-158:12), including product groups such as Raffinate ("RAF"), Jet Fuels and Kerosenes ("JKS"), and Naphtha ("NAP"), among others. (Ex. 11.) The product group called Normal Butane was abbreviated "NBT" and included three products: "mixed butane," "mixed normal," and "high purity normal but[ane]." (*Id.*) The Production Book used the abbreviation "LPG" for the product group called Propane. (*Id.*)

for Commercial Propane, Export Propane, and HD-5 Propane, but produced *no* specifications for butane-related products. (PES Resp. to RFP 45 [Ex. 13]; Ex. 14.)

PES also understood that, in the context of alternative fuels, "LPG" is synonymous with "propane" or "propane autogas." In 2015, PES held a two-day meeting of its senior leadership team, during which it explored "potential areas of opportunity" for the business to explore. (Depo. PES at 166:21-167:12.) One item considered was a project to "[r]educe in-house vehicle fleet costs through use of *alternative fuel*," specifically "NGL – *Propane Autogas*." (Ex. 15 at 69 (emphasis added).) The project contemplated that PES would replace "refinery light duty vehicles" with ones fueled by "LPG (propane)." (*Id.*) PES would "use refinery HD-5 propane specification as [a] source for powering motor vehicles" and, by using "an environmentally friendly alternative," PES would be "[e]ligible for federal and state tax credits on fuel." (*Id.*)

While propane autogas has long been synonymous with LPG in the context of alternative motor fuels, butane has not. While "billions of gallons per year of butane" are "used in the production of gasoline," butane "is not used directly as a motor vehicle fuel in the U.S." Nat'l Propane Gas Ass'n, *An Assessment of* Propane, at 2 (June 1989). Indeed, defendant's counsel has been unable to locate any evidence of fueling stations that sell butane for transportation use in the United States. That is no surprise, because "demand for butane for gasoline blending gradually phased most of the butane out of the U.S. LPG market by the 1950s, *effectively making the terms LPG and propane interchangeable*." Natural Gas Liquids at 14 (emphasis added). Moreover, due to its anti-knock performance and higher octane, propane is a far superior component of alternative motor fuels than butane. Campbell, Wyszynski & Stone, *Combustion of LPG in a Spark-Ignition Engine*, SAE Technical Paper 2004-01-0974 (2004) [Ex. 37]. Indeed, the purity of HD-5 propane allows LPG engines to be specially designed to operate with high

combustion efficiency, reducing the $CO_2$ emissions such engines produce. Rengarajan, et al., *LPG Direct Injection Engine for Medium Duty Trucks*, SAE Technical Paper 2020-01-5008 (2020) [Ex. 38].

To support its claim that the petroleum industry uses "liquefied petroleum gas" to reference butane, PES (at 15) relies heavily on ASTM International, D1835, Standard Specification for Liquefied Petroleum (LP) Gases [Ex. 39]. While PES invokes a statement in the introductory "scope" of the specification that broadly describes "those products commonly referred to as liquefied petroleum gases" in all contexts, it ignores more pertinent, specific requirements for LPG when used as an alternative motor fuel. (*See* ASTM D1835, § 1.1.) The ASTM lists specifications for four discrete LPG "product type[s]": (1) commercial propane, (2) commercial butane, (3) commercial PB [Propane/Butane] mixtures, and (4) special-duty propane. (*Id.*, Table 1.) While the commercial-butane and commercial-PB-mixture specifications allow those product types to contain butane, the ASTM contemplates that those products will be used as domestic, commercial, and industrial fuels, but *not* in internal combustion engines. (*Id.*, §§ X1.1.3.2, X1.1.3.3.)

In contrast, special-duty propane "is a product tailored to meet the restrictive needs of internal combustion engines" in "normal automotive applications." (*Id.*, §§ X1.1.3.4.) Special-duty propane is a "a product composed chiefly of propane which exhibits superior antiknock characteristics and was specifically developed for use as a fuel in spark-ignition internal combustion engines" (*Id.* § 3.1.5.) Special-duty propane must contain no less than 90% propane, no more than 5% propylene, and no more than 2.5% butane (referred to as a "heavier hydrocarbon contaminant"). (*Id.*, Table 1; Gas Processors Ass'n, GPA 2140, *Standard for Liquid Petroleum Gas Specifications and Test Methods* [Ex. 40].) Here, because § 6426(d)(2) defines

"liquefied petroleum gas" in the context of alternative fuels, it must reference the special-duty-propane product type in the ASTM specification, and *not* the other product types containing large butane concentrations, such as commercial butane and commercial PB mixtures.

The ASTM's use of the phrase "special-duty propane" is consistent with the use by Congress of the phrase "special motor fuels" as synonymous with "alternative fuels" (previously discussed at 8). Indeed, when the Energy Department described the composition of the alternative fuel "liquefied petroleum gas" in 1994, it referred specifically to the ASTM specification D1835 "standard for fuels" that limited the amount of propylene "allowed in LPG" to "5 percent." *Alternatives to Traditional Transportation Fuels* at 54. The *only* ASTM product type that includes such a propylene restriction is special-duty propane.[25]

As PES notes, the petroleum industry does use the plural "liquefied petroleum gases" to refer to a group of hydrocarbon gases with particular characteristics, and the singular "liquefied petroleum gas" to refer to products that may be comprised substantially of butane. However, as shown, those broad definitions do not apply in the context of alternative motor fuels, where LPG has a more precise meaning. When used to describe an alternative fuel, it is clear that LPG refers to propane autogas specifically, and it is not synonymous with butane.

### 3. The Court should reject the contrary definitions of LPG offered by PES.

To support its argument that "butane is a type of liquefied petroleum gas," PES refers (at 14-16) to "standard and technical dictionaries," "[s]tandard chemistry textbooks," and definitions from "actors in the fuel industry." Defendant acknowledges that the petroleum industry

---

[25] Moreover, under engine-testing regulations requiring manufacturers to certify their engines to EPA emissions standards, "liquefied petroleum gas" used in engine testing must be composed primarily of propane, with strict limits on its butane composition. 40 C.F.R. § 1065.720(a), (c).

sometimes uses the plural "liquefied petroleum gases" to refer to a category of hydrocarbon gases, and the singular "liquefied petroleum gas" to refer to specific fuel products that may contain butane (such as "commercial butane" specified in ASTM D1835). But, as explained in the above discussion of ASTM D1835, the Court should decline to apply those definitions here, but rather should be guided by the meaning of LPG in the context of alternative fuels.

For that reason, the LPG definitions cited by PES are inapposite. For example, the federal regulations that PES cites (at 18 n.10) from OSHA and the Departments of Transportation, Homeland Security, and Housing and Urban Development have nothing to do with alternative fuels for motor vehicles.[26] Nor do the "forty-two state statute definitions" (at 18 n.11), which primarily define LPG for safety rules governing the storage and transportation of products, rather than in the context of alternative motor fuels. For example, the California Vehicle Code defines "liquefied petroleum gas" broadly in connection with statutory requirements for the transportation of hazardous materials. *See* Cal. Veh. Code §§ 380, 27909. However, far more pertinent here are the California Air Resources Board regulations entitled "Specifications for Alternative Motor Fuels," 13 C.C.R. § 2290, *et seq.*, which define "alternative fuel" to include "liquefied petroleum gas," and which require "liquefied petroleum gas" in that context to include at least 85% propane and no more than 5% butane. 13 C.C.R. §§ 2290(a)(1), 2292.6.

The court decisions cited by PES (at 16-17) likewise fail to show that butane "is a type of liquefied petroleum gas" in the alternative-fuel context. In *Phillips Pipe Line Co. v. United States*, 94 Ct. Cl. 462 (1941), the Court of Claims stated that butane was "classified as a 'liquefied petroleum gas.'" That eighty-year-old case cannot be probative of the meaning of LPG

---

[26] *See* 24 C.F.R. § 3280.703 (home-heating equipment standards); 29 C.F.R. § 1910 (odorization and storage of gases); 33 C.F.R. § 127.005 (waterfront facility handling of gases); 46 C.F.R. § 58.16-5 (use for cooking and heating on vessels); 49 C.F.R. § 173.315(b)(1)(i) (packaging of gases).

today, considering that the "terms LPG and propane [became] interchangeable" in the 1950s, and not before. Natural Gas Liquids, at 14. Regardless, *Phillips Pipe Line* merely addressed whether "natural gasoline" was a "liquid product" of "crude petroleum" under the Revenue Act of 1932; it had nothing to do with whether butane qualifies as liquefied petroleum gas in the alternative fuel context. *Id.* at 472. The other cases that PES cited have no relevance here for similar reasons. *See Nat'l Union Fire Ins, Co. v. ExxonMobil Gas & Power Mktg. Co.*, 691 F. App'x 195 (5th Cir. 2017) (per curiam) (resolving contract claims regarding a propane sales agreement); *Shamrock Oil & Gas Corp. v. Commissioner*, 35 T.C. 979, 1028-40 (1961) (addressing computation of a depletion allowance for natural gas production).

Treasury Regulation § 48.4041-8(f)(1)(i) also does not support the interpretation of "liquefied petroleum gas" suggested by PES. In 1960, Treasury defined LPG as including "propane, butane, or pentane, or mixtures of the same," unless the fuel is "taxable under the provisions of section 4081." 26 C.F.R. § 48.4041-7(f)(1)(i) & (2) (1961); *see* Reg. § 48.4041-8(f)(1)(i) & (2) (current codification). Both butane and pentane have since been expressly rendered taxable as listed gasoline blend stocks under § 4081, leaving propane as the only substance that qualifies as an LPG in this context. (*See*, above, n.16.) Thus, both Congress and the Treasury Department have limited LPG to propane in the context of § 4041 and § 6426.[27]

PES suggests (at 17-18) that its position is supported by "other" IRS "guidance." But PES both overstates the relevance of the informal IRS documents generally, and it misreads the

---

[27] The other Treasury Regulations that PES cites are even further afield. Reg. § 1.907(c)-1(d)(6), Temp. Treas. Reg. § 1.927(a)-1T(g)(2)(ii)(c), and Reg. § 1.993-3(g)(3)(ii)(c) each define "liquefiable" or "liquefied" petroleum gases (*plural*) as "primary product[s]" from gas for certain international tax purposes. Treas. Reg. 1.7704-4(c)(5)(i)(B) addresses the determination of a publicly traded partnership's "qualifying income" for rules treating such a partnership as a corporation and what constitutes the "processing of natural gas" in that context. None addresses whether butane constitutes liquefied petroleum gas in the context of alternative fuels.

particular documents that it cites. Section 6110(b)(1)(A) defines IRS "written determinations" to

include, among other things, the private letter ruling, technical advice memorandum, and field

service advice to which PES cites, and § 6610(k)(3) provides that "a written determination may

not be used or cited as precedent." As this Court previously observed, "one can scarcely imagine

a prohibition more sweeping." *Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1, 9 (2001).

"While plaintiff blithely claims otherwise, its reliance on these materials plainly violates section

6110(k)(3)." *Principal Life Ins. Co. v. United States*, 95 Fed. Cl. 786, 790 n.5 (2010). For that

reason, numerous cases have declined to consider such documents.[28] *See, e.g., id.* ("In

accordance with the statute, the court will not consider [private letter rulings and chief counsel

advice] in resolving the pending motions.") Nor does the Internal Revenue Manual have any

value in interpreting the Code. *Qureshi v. United States*, 67 Fed. Cl. 783, 788 (2005) ("It is well

settled that the Internal Revenue Service Manual is not the law and therefore not binding on the

Government."), *aff'd*, 200 F. App'x 973 (Fed. Cir. 2006).

---

[28] PES cites *Buckeye Power Inc. v. United States*, 38 Fed. Cl. 154, 161 (1997), to suggest (at 18 n.9) that, despite § 6110(k)(3), technical advice memoranda ("TAMs") should still be given weight. PES is incorrect. First, the TAM in *Buckeye Power* spoke to the specific issue before the Court of whether an electric cooperative had to allocate its costs between power sold to members and non-members. The Court, which took care to explain that it would have reached the same result regardless of the TAM, *see id.* at 161 n.9, noted that the TAM "provide[d] a cohesive and logical discussion of the parameters of cooperative cost allocation." *Id.* at 161–62. Thus, it agreed with the "justifications" set forth in that TAM, but did not cite it as authority. *Id.* Second, *Buckeye Power* did not use a TAM to interpret the meaning of the Code, as PES asks the Court to do here.

PES cites *Natale v. E. Coast Salon Servs., Inc.*, No. 13-1254, 2016 WL 659722 (D.N.J. Feb. 18, 2016), for the same proposition (at 16 n.7). Its reliance on that case is also misplaced. That case involved a dispute between two private parties over whether, under a settlement agreement, the settlement payment should be made with an IRS Form 1099, or an IRS Form W-2. To interpret the parties' settlement agreement, the court looked to an IRS field service advice memorandum to see how the IRS treats settlement payments. The district court did not use the memorandum as a tool of statutory construction, as PES asks the Court to do here, but rather to enforce a settlement agreement between two private parties.

Regardless, as a substantive matter, the "other . . . guidance" that PES cites (at 17-18) is not persuasive, and the Court should disregard it for that independent reason. *First*, the Internal Revenue Manual expressly provides that "alternative fuel" does not include "any product taxable under section 4081," and it therefore excludes butane which is taxable as a gasoline blend stock under § 4081. *See* I.R.M. § 21.7.8.4.1.4.4.10. *Second*, Private Letter Ruling 6007053230A (July 5, 1960), and Technical Advice Memorandum 6007058570A (July 5, 1960), were issued decades before the IRS had identified butane as a gasoline blend stock and taxable fuel and before Congress had enacted the alternative fuel mixture credit. They have nothing to do with whether butane qualifies as LPG under § 6426(d)(2).

PES also refers to the *Vitol* case (at 17) to support its argument. While the district court there observed that the "common meaning of LPG includes butane," 2020 WL 1442136 at *2, it ultimately held that butane is not an alternative fuel under § 6426. Moreover, the district court there only discussed the "common meaning of LPG," but it did not address the meaning of the term in the alternative-fuel context, nor the many congressional statements equating LPG with propane. *Id.* And, while PES correctly notes (at 16) that a government expert in *Vitol* stated that "butane is always an LPG," the expert testified from his perspective as a petroleum-industry insider, and he did not address whether butane qualifies as LPG in the alternative-fuel context.

Finally, the suggestion by PES that the petroleum industry would universally interpret butane to qualify as LPG and an alternative fuel under § 6426 strains credulity. As Senator Grassley questioned, if butane was actually an alternative fuel—contrary to common sense and the intent of Congress—then why did the petroleum industry wait "more than 10 years to start claiming the credit for doing what they have been doing for" over a century? 165 Cong. Rec. S7185. If it was as clear as PES suggests that use of butane to produce gasoline qualified for an

-45-

alternative fuel mixture credit, then why did PES fail to claim the credit before 2017, even though it had registered with the IRS to sell certain fuel mixtures in 2012?

      **4.**       **The Court should adopt the government's interpretation of LPG.**

Defendant has shown clearly that, in the context of alternative fuels, "liquefied petroleum gas" means propane autogas, and not butane. While LPG may have a broader meaning in other contexts, there are many reasons why the Court should apply the narrower definition here.

***First***, to understand what Congress meant by "liquefied petroleum gas" in § 6426(d)(2), the Court must consider the meaning of the term being defined—here, "alternative fuel." An alternative fuel, "most generally defined, is any fuel other than the traditional selections, gasoline and diesel, used to produce energy and power." U.S. Dep't of Trans., *Fuels and Vehicle Technology*. Stephanie Eggert, the former Director of Operations at the PES refinery, agreed with this definition, stating her "understanding as to the commonly understood meaning of the phrase alternative fuel in the petroleum industry," as "something different than a typical fuel." (Eggert Depo. 152:9-14.) Unlike PES, which takes definitions out of context to support its aggressive tax position, the government here properly views liquefied petroleum gas through the prism of alternative fuel, *i.e.,* the "contextual factor of the word actually being defined." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 228 (2012); *see also id.* at 232 ("[T]he meaning of the definition is almost always closely related to the ordinary meaning of the word being defined.").

***Second***, while courts determine the meaning of ordinary words in a statute according to their ordinary meaning, courts determine the meaning of *technical* terms according to their *technical* meaning. *Corning Glass Works v. Brennan*, 417 U.S. 188, 201–02 (1974). While PES suggests (at 14) that the Court should apply "technical definitions from the relevant field," that field here is not the petroleum industry but rather the alternative-fuel industry, where LPG has a

specific, technical meaning. As the Supreme Court acknowledged in *Corning Glass*, the technical canon of construction "is particularly salutary where . . . the legislative history reveals that Congress incorporated words having a special meaning within the field regulated by the statute." *Id.* at 202. Here, the legislative history shows that Congress equated liquefied petroleum gas with propane, consistent with the technical meaning of LPG in the alternative-fuel field.

And, **third**, because tax credits are "a matter of legislative grace," PES bears the burden of showing that it is clearly entitled to the alternative fuel mixture credit. *Sunoco*, 129 Fed. Cl. at 331. "[T]here must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded." *Bank of Commerce*, 161 U.S. at 146. For that reason, if the Court were to determine that the term LPG in § 6426(d) may reasonably be interpreted as propane autogas, as the government argues, then the Court must apply that definition here, even if the Court believed that the interpretation suggested by PES might also be reasonable.

**C.     The "blending butane" used by PES contained heavy hydrocarbons and did not qualify as "liquefied petroleum gas" under fuel-industry specifications.**

Even if the Court were to apply the petroleum-industry definitions of liquefied petroleum gas on which PES relies, the "blending butane" that PES used to produce refined products would not qualify as LPG as a factual matter, and the United States should prevail on that ground alone.

To constitute liquefied petroleum gas under PES's petroleum-industry definitions, a substance must "principally," "primarily," and "predominantly" consist of propane, butane, or their isomers. *E.g.,* EIA Glossary ("primarily"); McGraw-Hill Dictionary of Scientific and Technical Terms 1217 (6th ed. 2002) ("principally"); GPA Standard 2140 ("predominantly"); 24 C.F.R. § 3280.702 (same); Cal. Veh. Code § 380 (same). In addition, to qualify as "liquefied petroleum gas (LPG)" in the petroleum industry, "propane and butane" must "meet[] market specifications." Petroleum Refining at 241. The ASTM and GPA specifications state precisely

how much propane or butane a substance must contain to constitute liquefied petroleum gas by restricting the percentage of "heavier hydrocarbon contaminants" such as pentanes and hexanes to 2.5% for commercial propane and special-duty propane, and to 2.0% for commercial butane and commercial PB mixtures. (*See* ASTM D1835, § 1.1; GPA 2140.) Because pentanes, hexanes and heavier hydrocarbons are *liquid* at standard temperature and pressure (Chemistry, § 21.1), they do not qualify as liquefied petroleum *gas* under any definition of the term.

Although the United States cannot conclusively show at this time the precise heavy-hydrocarbon content of PES's "blending butane" in the quarters at issue, it need not do so to prevail on summary judgment. That is because PES has the burden of proving that the "butane" it used to produce gasoline qualified as "liquefied petroleum gas" under the petroleum-industry specifications on which it relies, and it must present evidence of the components of the substance to do so. As made clear by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), the United States may prevail on summary judgment here if PES "fails to make a showing sufficient to establish an essential element to [its] case, and on which [it] will bear the burden of proof at trial." The United States has no obligation to "negat[e]" PES's claim. *Id.* To create a triable issue of fact and avoid summary judgment, PES must present evidence in response to defendant's cross-motion showing that heavy-hydrocarbon content of its blending butane was below the maximum percentage allowed by the industry specifications on which it relies.

From the discovery to date, it is difficult for the United States to compute the precise composition of the blending butane that PES used to produce gasoline, a process for which there is "obvious[] complexity." (PES Depo. 162:20-163:10.) However, it is clear that the "blending butane" had a very high concentration of pentanes and heavier hydrocarbons, far more than the portion allowed for any of the LPG product types in the petroleum-industry specifications.

-48-

The "blending butane" that PES produced from crude oil included streams of both mixed butane and normal butane. The PES refinery produced six discrete streams: (1) the 869 deisobutanizer at Point Breeze, (2) the 862 light-ends unit at Point Breeze, (3) the 860 reforming complex at Point Breeze; (4) the 1332 reforming complex at Girard Point; (5) the 431 deisobutanizer at Girard Point; and (6) the 433 alkylation unit at Girard Point. (Ex. 3 at 70, 72; PES Depo. 74:18-75:10, 77:20-78:5, 88:19-91:6; PES Memo. at 5-6.) Those six streams were comingled with butane PES purchased from third parties, and the resulting mixture constituted the blending butane that PES piped from the spheres to the gasoline-blending units.

On the last day in December of 2017 in which each stream was tested, the streams contained the following components:

|  | (#1) 869 Normal Butane 12/31/17 | (#2) 862 Mixed Butane 12/31/17 | (#3) 860 Mixed Butane 12/31/17 | (#4) 1332 Mixed Butane 12/31/17 | (#5) 431 Mixed Butane 12/31/17 | (#6) 433 Normal Butane 12/24/17 |
|---|---|---|---|---|---|---|
| Butane | 92.68% | 16.57% | 5.54% | 22.2% | 0.48% | 85.05% |
| Isobutane | 0.92% | 0.34% | 0.83% | 3.78% | 0.03% | 10.85% |
| Pentanes & Pentenes | 4.67% | 70.02% | 91.41% | 64.92% | 83.88% | 3.66% |
| Hexanes & Heavier | 1.53% | 12.83% | 0.71% | 8.22% | 15.58% | 0.0% |

(Ex. 16.) While these numbers reflect the content of those streams at specific points in time, they are generally consistent with results reported in December 2013 and are not atypical. (*See* Ex. 3 at 71, 73.) To correctly determine the average makeup of PES blending butane in the quarters at issue is a difficult exercise, requiring all test results for each quarter to be combined and weighted by the volume of each stream, along with the test results and volumes of butane that PES purchased in each quarter. While a thorough analysis may require the United States to use a testifying expert, it is beyond doubt that the heavy-hydrocarbon content of the PES blending butane is well beyond 2.5%, and likely approaches or even exceeds 50%.

-49-

**CONCLUSION**

PES tries to turn the alternative fuel mixture credit on its head, in order to pocket a $550 million windfall for making traditional gasoline. In the apt words of Senator Wyden, this "doesn't pass the commonsense test." 165 Cong. Rec. S7185. Two district courts have seen through the charade, and defendant asks this Court to do the same. There are three independent reasons why the Court should grant summary judgment to the United States. *First*, butane is not an alternative fuel for § 6426(e) because it is a gasoline blend stock and therefore a taxable fuel. *Second*, butane does not qualify as liquefied petroleum gas in the context of alternative fuels, where the term has a narrower meaning than in the petroleum industry. And, *third*, PES's "blending butane" does not qualify as LPG, even under the petroleum-industry definition, because of the heavy-hydrocarbon contaminants it contains.

                                       Respectfully submitted,

December 28, 2020                    *s/ Jason Bergmann*
                                       JASON BERGMANN
                                       U.S. Department of Justice, Tax Division
                                       Post Office Box 26
                                       Washington, D.C. 20044
                                       Tel: (202) 616-3425
                                       Fax: (202) 514-9440
                                       jason.bergmann@usdoj.gov

                                       RICHARD E. ZUCKERMAN
                                          Principal Deputy Assistant Attorney General
                                       DAVID I. PINCUS
                                          Chief, Court of Federal Claims Section
                                       G. ROBSON STEWART
                                          Assistant Chief

December 28, 2020                    *s/ G. Robson Stewart*
                                       Of Counsel